## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES ZIMMERMAN, Derivatively on Behalf of BAUSCH & LOMB INCORPORATED and Individually on Behalf of Himself and all Others Similarly Situated, | Civil Action No.<br><br>Related to: Lead Civil Action No. 06-CV-6298-MAT-MWP |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |
| RONALD L. ZARRELLA, WILLIAM H. WALTRIP, WILLIAM M. CARPENTER, STEPHAN C. MCCLUSKI, JOHN M. LOUGHLIN, DWAIN L. HAHS, ANGELINA J. PANZARELLA, ROBERT B. STILES, KAMAL K. SARBADHIKARI, GEOFFREY F. IDE, RUTH R. MCMULLIN, KENNETH L. WOLFE, LINDA JOHNSON RICE, JONATHAN S. LINEN, DOMENICO DE SOLE, BARRY W. WILSON, PAUL A. FRIEDMAN, ALAN M. BENNETT, JOHN R. PURCELL, FRANKLIN E. AGNEW, ALVIN W. TRIVELPIECE, CATHERINE M. BURZIK and WARBURG PINCUS LLC, | <u>JURY TRIAL DEMANDED</u> |
| Defendants, | |
| -and- | |
| BAUSCH & LOMB INCORPORATED, a New York corporation, | |
| Nominal Defendant. | |

---

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative and Class Action Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Bausch & Lomb Incorporated ("Bausch & Lomb" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law that occurred between April 2000 and the present (the "Relevant Period") and that have caused substantial losses to Bausch & Lomb and other damages, such as to its reputation and goodwill.

2.     This action is also being brought as a class action by a shareholder of Bausch & Lomb on behalf of all shareholders of the Company seeking injunctive relief and monetary damages against Bausch & Lomb's Board of Directors (the "Board") for its formulation and approval of the proposed acquisition of Bausch & Lomb by affiliates of Warburg Pincus LLC ("Warburg Pincus") at a grossly inadequate price designed to extinguish the individual defendants' personal liability stemming from their breaches of fiduciary duty.  This lawsuit is necessary to protect Bausch & Lomb and its shareholders from the individual defendants' continuing breaches of fiduciary duties and conflicts of interest, and to hold the individual defendants accountable for their wrongful conduct.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

4.     This Court has jurisdiction over each defendant named herein pursuant to 28 U.S.C. §1391(a) because each defendant is either a corporation that conducts business in and maintains operations in the District, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

5.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Bausch & Lomb and its shareholders occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

6.      During the Relevant Period, defendants caused or allowed the Company to file with the Securities and Exchange Commission ("SEC") and disseminate to investors and the Company's shareholders inaccurate financial statements that improperly portrayed Bausch & Lomb's financial results and business prospects.   Further, as a result of Bausch & Lomb's inaccurate financial reporting, its shares traded at an artificially inflated level at times relevant hereto.  On December 22, 2005, defendants were forced to reveal that Bausch & Lomb's prior statements were false and that Bausch & Lomb's financial statements for FY:00 to 2Q:05 would have to be restated.   In the aftermath, Bausch & Lomb's market capitalization was devastated by over $1.2 billion.  Certain of the defendants capitalized on the Company's artificially inflated shares by selling over $51 million of their personally held shares while in possession of material non-public information.  As a result of defendants' wrongdoing, the Company is now exposed to massive liability for violations of federal securities laws.  The Company has also been damaged by the costs that it incurred to investigate and restate its financials for FY:00 to 2Q:05.

7.      Following the revelation of the full extent of the accounting issues and financial restatements, the director defendants engineered the sale of the Company to guarantee that they would be insulated from liability for the wrongdoing detailed herein and to have their personal indebtedness extinguished.

8.      Namely, on May 16, 2007, the defendants announced that Bausch & Lomb had entered into a definitive agreement pursuant to which Warburg Pincus would acquire Bausch & Lomb for $65.00 per share in cash or $4.5 billion in total for all of the Company's outstanding common stock (the "Warburg Merger").  This sum represents a paltry premium of 5.7 percent over the closing price of Bausch & Lomb's stock on May 15, 2007, the day preceding the public announcement of the Warburg Merger.  As detailed below, the Warburg Merger is the product of a flawed process undertaken by the director defendants in order to reap substantial financial benefits from the cash-out of all unvested Company equity and other long-term compensation awards and to

discharge their own personal indebtedness and that of the other individual defendants to whom they remain loyal.

9.      Further, rather than fulfill their duty to maximize the value obtained for the shareholders in a sale of the Company, the director defendants improperly favored Warburg Pincus in this process and therefore limited the potential for superior proposals.  Indeed, Warburg Pincus was given an *eight month* head start over other potential acquirers to conduct due diligence on the Company despite the fact the Company spurned other bidders.  Moreover, the recent turmoil at Bausch & Lomb, including product recalls and restatements of several quarters' worth of financial statements due to improper accounting at certain foreign subsidiaries gave rise to numerous complexities which any potential acquirer wanting to conduct due diligence could not likely address in the 50 day "go shop" period allotted under the Warburg Merger agreement.  Notably Jack T. Ciesielsk, an accounting expert with R. G. Associates said that "private equity firms like Warburg had an advantage over other investors in assessing a company's value if the company has not been filing public financial statements.  I'm surprised nobody is jumping up and down and saying, "How fair is this?""  If the director defendants had truly wished to achieve the highest possible price for the Company they would have subjected the Company to a market check or auction process long before entering into a binding agreement with Warburg Pincus with the attendant termination fees and restrictive "go shop" period.

10.      Because the director defendants dominate and control the business and corporate affairs of Bausch & Lomb and are in possession of private corporate information concerning Bausch & Lomb's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between the director defendants and the public shareholders of Bausch & Lomb, which make it inherently unfair for the director defendants to pursue any transaction where they will reap disproportionate benefits at the expense of maximizing stockholder value.

11.      Each of the defendants is directly violating or aiding and abetting the other defendants' violations of the fiduciary duties owed to the public shareholders of Bausch & Lomb.

12.     The director defendants, as defined below, are also breaching their fiduciary duties by failing to fully disclose to the Company's shareholders material information and/or providing them with materially misleading information concerning the Warburg Merger.

13.     In short, the Warburg Merger is designed to unlawfully divest Bausch & Lomb's public stockholders of their holdings without providing them the maximized value they are entitled to and without adequate information to evaluate the proposed transaction.

14.     As the director defendants have unlawfully placed their own interests ahead of Bausch & Lomb's shareholders, the consummation of the Warburg Merger will result in irreparable harm absent judicial intervention.

## THE PARTIES

15.     Plaintiff Charles Zimmerman is, and was at times relevant hereto, an owner and holder of Bausch & Lomb common stock.  Plaintiff is a citizen of New Jersey.

16.     Nominal defendant Bausch & Lomb is a corporation organized and existing under the laws of the state of New York with its headquarters located at One Bausch & Lomb Place, Rochester, New York.  Nominal defendant Bausch & Lomb is an eye health company. Its core businesses include soft and rigid gas permeable contact lenses and lens care products, and ophthalmic surgical and pharmaceutical products.  Bausch & Lomb common stock is traded on the NYSE under the symbol "BOL."

17.     Defendant Ronald L. Zarrella ("Zarrella") is, and at all times relevant hereto was, Chairman of the Board, Chief Executive Officer ("CEO") and a director of Bausch & Lomb since 2001.  Because of Zarrella's positions, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Zarrella participated in the issuance of false and/or misleading statements,

including the preparation of the false and/or misleading press releases and SEC filings.  For FY:01, Bausch & Lomb paid defendant Zarrella $67,772 in salary and other compensation and granted him 500,000 options to purchase Bausch & Lomb stock.  For FY:02, Bausch & Lomb paid defendant Zarrella $4,535,055 in salary and other compensation, $5,581,081 in restricted stock awards and granted him 500,000 options to purchase Bausch & Lomb stock.  For FY:03, Bausch & Lomb paid defendant Zarrella $1,257,171 in salary and other compensation, $1,628,000 in bonus compensation, $1,745,178 in long term incentive payouts and granted Zarrella 180,000 options to purchase Bausch & Lomb stock.  For FY:04, Bausch & Lomb paid defendant Zarrella $1,348,368 in salary and other compensation, $1,650,000 in bonus compensation, $2,383,049 in long term incentive payouts and granted Zarrella 117,650 options to purchase Bausch & Lomb stock.  During the Relevant Period, Zarrella sold 255,000 shares of Bausch & Lomb stock for proceeds of $16,689,318.  Additionally, Zarrella serves on the Board of Trustees of the Committee for Economic Development ("CED") with W. Bowman Cutter, managing director of Warburg Pincus.  Zarrella also serves as a member of the board of directors of Avaya, Inc. along with Joseph L. Landy, Co-President and member of the Executive Management Committee of Warburg Pincus.  Zarrella is a citizen of Connecticut.

18.     Defendant William H. Waltrip ("Waltrip") was, at all times relevant hereto, Interim Chairman of the Board and CEO of Bausch & Lomb from September 2001 until November 2001. Waltrip is, and at all times relevant hereto was, a director of Bausch & Lomb since 1955.  Waltrip served as Chair of the Special Committee formed by the Board to review, analyze and make recommendations concerning the proposed acquisition by Warburg Pincus.  Because of Waltrip's positions, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other

information provided to him in connection therewith.  During the Relevant Period, Waltrip participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:01, Bausch & Lomb paid defendant Waltrip $172,050 in salary and other compensation and granted Waltrip 50,000 options to purchase Bausch & Lomb stock.  During the Relevant Period, Waltrip sold 156,279 shares of Bausch & Lomb stock for proceeds of $11,027,258.50.  Waltrip is a citizen of Connecticut.

19.     Defendant W.M. Carpenter ("Carpenter") was, at times relevant hereto, Chairman of the Board, CEO and a director of Bausch & Lomb until September 2001.  Carpenter became a director of Bausch & Lomb in 1996.  Because of Carpenter's positions, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Carpenter participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:00, Bausch & Lomb paid defendant Carpenter, $973,651 in salary and other compensation, $965,512 in long term incentive payouts and granted Carpenter 149,000 options to purchase Bausch & Lomb stock.  For FY:01, Bausch & Lomb paid defendant Carpenter $886,136 in salary and other compensation and granted Carpenter 200,000 options to purchase Bausch & Lomb stock.  Carpenter is a citizen of New York.

20.     Defendant Stephen C. McCluski ("McCluski") is, and at all times relevant hereto was, Chief Financial Officer ("CFO") and Senior Vice President of Bausch & Lomb. Because of McCluski's positions, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, McCluski participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:00, Bausch & Lomb paid defendant McCluski $440,065 in salary and other compensation, $232,962 in long term incentive payouts and granted McCluski 39,500 in options to purchase Bausch & Lomb stock.  For FY:01, Bausch & Lomb paid defendant McCluski $418,455 in salary and other compensation, $69,795 in restricted stock awards and granted McCluski 50,000 options to purchase Bausch & Lomb stock.  For FY:02, Bausch & Lomb paid defendant McCluski $520,245 in salary and other compensation, $219,635 in bonus compensation, $101,277 in restricted stock awards and granted McCluski 35,000 options to purchase Bausch & Lomb stock.  For FY:03, Bausch & Lomb paid defendant McCluski $479,288 in salary and other compensation, $340,000 in bonus compensation, $261,814 in long term incentive payouts and granted McCluski 40,000 options to purchase Bausch & Lomb stock.  For FY:04, Bausch & Lomb paid defendant McCluski $503,262 in salary and other compensation, $546,507 in bonus compensation, $536,261 in long term incentive payouts and granted McCluski 35,000 options to purchase Bausch & Lomb stock.  During the Relevant Period, McCulski sold 71,487 shares of Bausch & Lomb stock for proceeds of $4,891,116.82.  McCluski is a citizen of Florida.

21.    Defendant John M. Loughlin ("Loughlin") is, and at all times relevant hereto was, Senior Vice President and President of the Asia Region of Bausch & Lomb.  Because of Loughlin's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection

therewith.   During the Relevant Period, Loughlin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Loughlin sold 90,283 shares of Bausch & Lomb stock for proceeds of $6,600,739.34.  Loughlin is a citizen of New York.

22.     Defendant Dwain L. Hahs ("Hahs") is, and at all times relevant hereto was, Senior Vice President of Global Operations and Engineering of Bausch & Lomb.   Because of Hahs' position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.   During the Relevant Period, Hahs participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Hahs sold 15,320 shares of Bausch & Lomb stock for proceeds of $1,169,694.50.   Hahs is a citizen of New York.

23.     Defendant Angela J. Panzarella ("Panzarella") is, and at all times relevant hereto was, Vice President of Global Vision Care of Bausch & Lomb.   Because of Panzarella's position, she knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.   During the Relevant Period, Panzarella participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Panzarella sold 2,190 shares of Bausch & Lomb stock for proceeds of $153,509.40.  Panzarella is a citizen of New York.

24.     Defendant Robert B. Stiles ("Stiles") is, and at all times relevant hereto was, Senior Vice President and General Counsel of Bausch & Lomb.  Because of Stiles' positions, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Stiles participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Stiles sold 55,189 shares of Bausch & Lomb stock for proceeds of $3,964,709.66.  Stiles is a citizen of New York.

25.     Defendant Kamal K. Sarbadhikari ("Sarbadhikari ") is, and at all times relevant hereto was, Vice President of Regulatory and Quality Affairs of Bausch & Lomb.  Because of Sarbadhikari's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Sarbadhikari participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Sarbadhikari sold 37,100 shares of Bausch & Lomb stock for proceeds of $2,802,064.  Sarbadhikari is a citizen of New York.

26.     Defendant Geoffrey F. Ide ("Ide") is, and at times all relevant hereto was, Regional Vice President of Bausch & Lomb.  Because of Ide's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections

with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Ide participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Ide sold 33,500 shares of Bausch & Lomb stock for proceeds of $2,482,313.  Ide is a citizen of Massachusetts.

27.     Defendant Ruth R. McMullin ("McMullin") is, and at all times relevant hereto was, a director of Bausch & Lomb since 1987.  Because of McMullin's position, she knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, McMullin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, McMullin sold 4,630 shares of Bausch & Lomb stock for proceeds of $220,672.50.  McMullin is a citizen of Georgia.

28.     Defendant Kenneth L. Wolfe ("Wolfe") is, and at all times relevant hereto was, a director of Bausch & Lomb since 1989.  Because of Wolfe's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Wolfe participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the

Relevant Period, Wolfe sold 8,818 shares of Bausch & Lomb stock for proceeds of $603,357.77. Wolfe is a citizen of Pennsylvania.

29.     Defendant Linda Johnson Rice ("Rice") is, and at all times relevant hereto was, a director of Bausch & Lomb since 1990.  Because of Rice's position, she knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period Rice, participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Rice sold 8,396 shares of Bausch & Lomb stock for proceeds of $546,218.29.  Rice is a citizen of Illinois.

30.     Defendant Jonathan S. Linen ("Linen") is, and at all times relevant hereto was, a director of Bausch & Lomb since 1996.  Linen served as a member of the Special Committee. Because of Linen's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Linen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Additionally, Linen serves on the board of directors of Yum! Brands, Inc. along with David W. Dorman, senior adviser to Warburg Pincus. Linen is a citizen of New York.

31.     Defendant Domenico De Sole ("De Sole") is, and at all times relevant hereto was, a director of Bausch & Lomb since 1996.  De Sole served as a member of the Special Committee. Because of De Sole's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, De Sole participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  De Sole is a citizen of New York.

32.     Defendant Barry W. Wilson ("Wilson") is, and at times relevant hereto was, a director of Bausch & Lomb since 2003.  Because of Wilson's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Wilson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Wilson is a citizen of New York.

33.     Defendant Paul A. Friedman ("Friedman") is, and at times relevant hereto was, a director of Bausch & Lomb since 2004.  Because of Friedman's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

During the Relevant Period, Friedman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Friedman is a citizen of California.

34.     Defendant Alan M. Bennett ("Bennett") is, and at all times relevant hereto was, a director of Bausch & Lomb since 2004.  Because of Bennett's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Bennett participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Bennett is a citizen of Connecticut.

35.     Defendant John R. Purcell ("Purcell") was, at times relevant hereto, a director of Bausch & Lomb from 1976 until 2005.  Because of Purcell's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Purcell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Purcell sold 2,850 shares of Bausch & Lomb stock for proceeds of $187,705.  Purcell is a citizen of Florida.

36.     Defendant Franklin E. Agnew ("Agnew") was, at times relevant hereto, a director of Bausch & Lomb from 1982 until 2004.  Because of Agnew's position, he knew the adverse, non-

public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Agnew participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Agnew is a citizen of South Carolina.

37.   Defendant Alvin W. Trivelpiece ("Trivelpiece") was, at times relevant hereto, a director of Bausch & Lomb from 1989 until 2001. Because of Trivelpiece's position, he knew the adverse, non-public information about the business of Bausch & Lomb, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Trivelpiece participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Trivelpiece is a citizen of Tennessee.

38.   Defendant Catherine M. Burzik ("Burzik") has been a Bausch & Lomb director since 2007. Burzik also serves as a director of Kinetic Concepts, Inc. Burzik is a citizen of Illinois.

39.   Defendant Warburg Pincus is a private equity firm that has been operating since 1971. The New York-based firm has nine offices located around the world. Warburg Pincus traces its roots to E.M. Warburg & Co., an investment banking and private investment counseling firm founded in 1939 by Eric M. Warburg. In 1966, the firm joined with Lionel I. Pincus & Co., a venture capital, investment and financial consulting firm. Warburg Pincus claims approximately $20 billion of assets under management.

40.     The defendants identified in ¶¶17-19, 27-38 are referred to herein as the "Director Defendants."[1]   The defendants identified in ¶¶17-26 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17-18, 20-29, 35 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers, directors and/or fiduciaries of Bausch & Lomb and because of their ability to control the business and corporate affairs of Bausch & Lomb, the Individual Defendants owed Bausch & Lomb and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Bausch & Lomb in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Bausch & Lomb and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

42.     Each director and officer of the Company owes to Bausch & Lomb and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

---

[1]  The "Current Director Defendants" are identified in ¶¶17-18, 27-34 and 38.

43. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bausch & Lomb, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Bausch & Lomb, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Bausch & Lomb.

44. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bausch & Lomb, and was at all times acting within the course and scope of such agency.

45. To discharge their duties, the officers and directors of Bausch & Lomb were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Bausch & Lomb were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

        (e)     remain informed as to how Bausch & Lomb conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

        (f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

46.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bausch & Lomb, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Bausch & Lomb's Board during the Relevant Period.

47.    The Individual Defendants breached their duties of loyalty and good faith by allowing and/or causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of Individual Defendants' illegal actions and course of conduct during the

Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, Bausch & Lomb has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)     Costs incurred in investigating and defending Bausch & Lomb and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(c)     Additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums; and

(d)     Costs incurred from directing manpower to correct Bausch & Lomb's defective internal controls.

48.     Moreover, these actions have irreparably damaged Bausch & Lomb's corporate image and goodwill.

49.     In addition to the foregoing, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change of corporate control; or (ii) a sale of all or substantially all of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take action which:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibit them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search, secure and obtain the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors with preferential treatment at the expense of, or separate from, the public shareholders.

50.     In accordance with their duties of loyalty and good faith, the defendants, as directors and/or officers of Bausch & Lomb are obligated to refrain from:

(a)     Participating in any transaction where the directors' or officers' loyalties are divided;

(b)     Participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

51.     Plaintiff alleges herein that defendants, separately and together, in connection with the Warburg Merger, are knowingly and recklessly violating their fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company. These include a breach of the duties of loyalty, good faith and independence, to the extent they stood on both sides of the transaction and engaged in self-dealing and obtained personal benefits, including personal financial benefits not shared equally by plaintiff or Bausch & Lomb's other public shareholders. Moreover, the Current Director Defendants have chosen not to provide shareholders with all the information necessary to make an informed decision in connection with the Warburg Merger.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

53.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results; (ii) maintain the Individual Defendants' executive and directorial positions at Bausch & Lomb and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of Bausch & Lomb, regarding the Individual Defendants' management of Bausch & Lomb's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

54.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least April 2000 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that Bausch & Lomb was misrepresenting its financial results and also made other specific, false statements about Bausch & Lomb's financial performance, as alleged herein.  In addition, the Individual Defendants have taken advantage of the damage they themselves caused to Bausch & Lomb by undertaking now to sell the Company at a severely discounted price in order to escape personal liability, cash-out

valuable unvested Company equity and other long-term compensation awards and to maintain their positions of power and prestige at the Company or trigger value change of control severance benefits.

55.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment and to conceal adverse information concerning the Company's operations, financial condition and future business prospects so they could: (i) dispose of over $51 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

56.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

57.    Furthermore, each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**IMPROPER STATEMENTS**

58.    The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Bausch & Lomb a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately

carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.

59.     For FY:00, defendants Waltrip, De Sole, Linen and McMullin served as members of the Audit Committee.  For FY:01, defendants Linen, De Sole, McMullin, Rice and Waltrip served as members of the Audit Committee.  For FY:02, defendants Linen, De Sole, McMullin, Rice and Waltrip served as members of the Audit Committee.  For FY:03, defendants Wolfe, De Sole, McMullin and Rice served as members of the Audit Committee.  For FY:04, defendants Wolfe, Bennett and De Sole served as members of the Audit Committee.  The current members of the Audit Committee are defendants Wolfe, Bennett, De Sole and Wilson.  Furthermore, these defendants, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for reviewing and discussing with management the Company's quarterly financial statements, as well as financial information and earnings guidance provided to analysts and rating agencies.  Officer Defendants Zarrella, Waltrip, Carpenter, McCluski, Loughlin, Hahs, Panzarella, Stiles, Sarbadhikari and Ide had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, Director Defendants Zarrella, Linen, Waltrip, Wolfe, Bennett, De Sole, McMullin, Wilson, Friedman and Rice had ample opportunity to discuss this material information with management and/or their fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board.  Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Bausch & Lomb to the investing public and the Company's shareholders during the Relevant Period.

60.     On April 13, 2000, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces First Quarter 2000 Earnings." The earnings press release sated in relevant part:

> Bausch & Lomb announced today that revenues from ongoing product lines for the first quarter, which ended March 25, 2000, were $406.9 million, up 4% from the $389.8 million reported in the first quarter of 1999. Excluding the negative impact of changes in foreign currency exchange rates, particularly in Europe, U.S. dollar revenues increased by 6%.

> The company reported net earnings of $39.1 million, or $.68 per share, for the first quarter of 2000, compared to $22.4 million, or $.39 per share, in the same period last year.

> \* \* \*

> Commenting on the results for the quarter, William M. Carpenter, Bausch & Lomb's chairman and chief executive officer, said, "We are very pleased with the results we announced today. Our revenues and operating earnings were in line with our expectations, excluding the impact of currency rate changes. It is our goal to minimize the impact of currency swings on our net earnings with the judicious use of hedging programs. This quarter, income from such programs substantially offset the negative impact currency had on operating results, allowing us to achieve net earnings in line with our overall goals for the quarter."

61.     On May 4, 2000, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the April 13, 2000 earnings press release.  The Form 10-Q was signed by defendants Stiles and McCluski.

62.     On July 19, 2000, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces Second-Quarter 2000 Results."  The earnings press release stated in relevant part:

> Bausch & Lomb announced today the results of its operations for the second quarter, which ended June 24, 2000.

> Revenues from the company's continuing operations were $452.9 million, essentially even with the $453.3 million reported in the second quarter of 1999. Changes in foreign currency exchange rates had a slightly negative impact on reported revenues.

> Reported net earnings were $34.6 million, or $.64 per share, for the second quarter of 2000, compared to $173.4 million, or $2.94 per share, in the same period last year. Prior year earnings included $18.2 million after taxes, or $.31 per share, related to discontinued operations, and a gain of $126.3 million after taxes, or $2.14 per share, on the divestiture of the sunglass business.

* * *

Commenting on the results reported today, William M. Carpenter, Bausch & Lomb's chairman and chief executive officer, said, "On balance, we are satisfied with the results for the second quarter. Products associated with the key initiatives we have identified for long-term growth - new contact lenses, refractive surgery and proprietary pharmaceuticals - continued to perform well. Our revenues, however, were negatively affected by short-term market issues in our U.S. lens care and pharmaceuticals businesses. Despite these challenges, we achieved our overall financial goals this quarter as a result of significant improvements in the profitability of our vision care and surgical businesses." Carpenter continued, "While we expect the U.S. market issues to impact our revenues for the balance of this year, we are equally confident that our earnings will continue to benefit from the higher margins associated with our new products, as well as from the savings generated by the cost reduction initiatives we announced last year. As a result, we remain comfortable with our previous earnings guidance for our current businesses for the second half of this year."

63.    On August 7, 2000, the Individual Defendants caused or allowed the Company to file a Form 10-Q that repeated the Company's financial results disclosed in the July 19, 2000 earnings press release. The Form 10-Q was signed by defendants Stiles and McCluski.

64.    On October 12, 2000, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces Third-Quarter 2000 Results." The earnings press release stated in relevant part:

--    Revenues of $440.9 million down 1% from third quarter of 1999 and up 2% when adjusted for the negative impact of currency

--    Comparable basis earnings per share from continuing operations of $.70 up 9% from prior year and in line with Wall Street estimates

* * *

Bausch & Lomb announced today the results of its operations for the third quarter, which ended September 23, 2000. Revenues from the company's continuing operations were $440.9 million, down 1% from the $446.3 million reported in the third quarter of 1999. In constant dollars (that is, excluding the impact of changes in foreign currency exchange rates), revenues increased 2% over the prior year period.

Reported net earnings were $14.7 million, or $.27 per share, for the third quarter of 2000, compared to $231.8 million, or $3.94 per share, in the same period last year. However, the reported results include a number of items that make year-to-year comparisons difficult. Excluding the impact of the following items, comparable basis net earnings from continuing operations were $37.8 million, or $.70 per share, in the third quarter of 2000, compared to $37.3 million, or $.64 per share, in 1999, an increase of 9%.

Prior year results included $8.4 million after taxes, or $.14 per share, related to earnings from discontinued operations, and a gain of $181.8 million after taxes, or

$3.09 per share, on the divestiture of the former healthcare businesses. In addition, the prior year quarter included a pre-tax gain on redemption of securities of $6.7 million, or $.07 per share after taxes.

\* \* \*

William M. Carpenter, Bausch & Lomb's chairman and chief executive officer, said, "The results we reported today were, on the whole, in line with the updated guidance we issued earlier in the quarter. Revenues were somewhat lower than our expectations as a result of further deterioration in currency rates since August and the timing of laser installations. …"

65.     On November 7, 2000, the Individual Defendants caused or allowed the Company to file a Form 10-Q that repeated the Company's financial results disclosed in the October 12, 2000 earnings press release.  The Form 10-Q was signed by defendants Stiles and McCluski.

66.     On January 25, 2001, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces Fourth-Quarter 2000 Results." The earnings press release stated in relevant part:

--      Comparable basis revenues increase 1% from prior year and 6% when adjusted for currency

--      Comparable basis earnings per share of $.70 versus $.88 in 1999 in line with updated company guidance

--      Company announces forward purchase transaction for company shares

Bausch & Lomb announced today the results of its operations for the fourth quarter, which ended December 30, 2000.

Reported revenues during the period were $462.4 million, down 1% from the $466.6 million reported in the fourth quarter of 1999.

Revenues in 2000 were reduced by $6.8 million as a result of a previously announced change in accounting estimate in connection with the transition to a new methodology for calculating reserves for contractual pricing allowances in the U.S. generic pharmaceuticals business. Excluding the impact of this change in accounting estimate, revenues in the fourth quarter of 2000 were $469.2 million, up 1% from the prior year period. Changes in foreign currency exchange rates reduced reported revenue growth by 5 percentage points.

Reported net earnings were $4.6 million, or $.09 per share, for the fourth quarter of 2000, compared to $17.2 million, or $.29 per share, in the same period last year. Excluding the impact of accounting charges and other items recorded in both years, net earnings were $37.4 million, or $.70 per share, in the fourth quarter of 2000, compared to $51.4 million, or $.88 per share, in 1999.

\* \* \*

Commenting on today's announcement, William M. Carpenter, Bausch & Lomb's chairman and chief executive officer, said, "Although the results we announced today were in line with our recent guidance, 2000 was clearly a difficult year for us. Our businesses outside the U.S. performed very well, but our U.S. businesses were hampered by a variety of market factors that were compounded by operational issues. We have taken decisive actions to address these issues, including restructuring the company in order to better leverage our functional capabilities and become more responsive to changing market conditions and customer needs. At the same time, we are continuing to invest in new products and breakthrough technology that will drive our growth in the future. As a result, we are confident that our performance will improve over the course of 2001 and beyond."

67.    On March 28, 2001, the Individual Defendants caused or allowed the Company to file

a Form 10-K for FY:00 which repeated the Company's financial results disclosed in the January 25,

2001 earnings press release.  The Form 10-K was signed by defendants McCluski, Carpenter, Agnew,

De Sole, Linen, McMullin, Purcell, Rice, Trivelpiece, Waltrip, Wolfe and Stiles.

68.    On April 26 2001, the Individual Defendants caused or allowed the Company to issue

an earnings press release entitled "Bausch & Lomb Announces First-Quarter 2001 Results."  The

earnings press release stated in relevant part:

--    Revenues were up 1% from prior year and up 5% when adjusted for changes in currency rates

--    Comparable basis earnings per share of $.12 versus $.42 in 2000 in line with company guidance

--    Company provides update on expectations for the remainder of 2001

Bausch & Lomb announced today the results of its operations for the first quarter, which ended March 31, 2001. Net sales during the period were $412.2 million, up 1% from the $408.9 million reported in the first quarter of 2000. In constant dollars (excluding the impact of changes in foreign currency exchange rates), revenues grew 5%.

Excluding the impact of restructuring charges and asset write-offs recorded in the current period and non-recurring gains recorded in both years, net earnings were $6.2 million, or $.12 per share in the first quarter of 2001, compared to $23.9 million, or $.42 per share in the first quarter last year. Reported earnings in the first quarter 2001 were reduced by charges and asset write-offs of $11.0 million after taxes, or $.21 per share, associated with the company's previously-announced restructuring initiatives, as well as the write-off of the company's minority investment in a business-to-business e-commerce venture for the vision care industry. Net earnings in the current period were augmented by a gain of $3.5 million after taxes, or $.07 per share, from the sale of a portion of the company's equity interest in Charles River Laboratories, Inc. that the company retained when that business was divested in 1999. In the first quarter of 2000, the company recorded non-operating income of $15.2 million after taxes, or $.26 per share, related to the settlement of patent

litigation. Including these items and a small gain due to the adoption of SFAS 133, the company reported a net loss of $1.0 million, or $.02 per share, in the current period, compared to net income of $39.1 million, or $.68 per share, in the first quarter of 2000.

\* \* \*

Commenting on today's announcement, William M. Carpenter, Bausch & Lomb's chairman and chief executive officer, said, "Our results this quarter were consistent with our expectations. Coming into this year, we were aware that there were a number of factors that would make for difficult year-over-year comparisons this quarter."

69.     On May 14, 2001, the Individual Defendants caused or allowed the Company to file a

Form 10-Q which repeated the Company's financial results disclosed in the April 26, 2001 earnings

press release.  The Form 10-Q was signed by defendants Stiles and McCluski.

70.     On July 19, 2001, the Individual Defendants caused or allowed the Company to issue

a second quarter FY:01 earnings press release entitled "Bausch & Lomb Announces Second Quarter

2001 Results."  The earnings press release stated in relevant part:

--      Revenues of $414 million in line with company's update in June

--      Company reports net earnings of $.13 per share

--      Long-time board member William H. Waltrip returns as Chairman

Bausch & Lomb announced today the results of its operations for the second quarter, which ended June 30, 2001. Net sales during the period were $414.0 million, down 9% from the $455.2 million reported in the second quarter of 2000, and in line with updated guidance the company issued on June 12, 2001. In constant dollars (excluding the impact of changes in foreign currency exchange rates), revenues were down 5%.

Net earnings were $6.8 million, or $.13 per share, compared to $34.6 million, or $.64 per share, reported for the second quarter of 2000. Prior year earnings reflected charges totaling $.10 per share related to the company's attempted acquisition of a competitor and the settlement of litigation. Excluding these items, net earnings in the second quarter of 2000 were $40.0 million, or $.74 per share.

\* \* \*

Commenting on results for this quarter, William M. Carpenter, Bausch & Lomb's chief executive officer, said, "Our business outside the U.S., which now comprises the majority of our sales, continues to perform very well in most markets, excluding the impact of swings in currency exchange rates. As we highlighted in June, however, our performance continues to be hindered by the very difficult conditions we are dealing with in the U.S. market. While we anticipate that these issues will remain challenging over the rest of 2001, we are confident that we are

taking the right steps to ensure that our businesses are well-positioned for a return to solid growth next year."

71.     On August 10, 2001, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the July 19, 2001 earnings press release.  The Form 10-Q was signed by defendants Stiles and McCluski.

72.     On October 18, 2001, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces Third-Quarter 2001 Results." The earnings press release stated in relevant part:

--      Revenues of $434 million down 2% from prior year

--      Company reports earnings of $.43 per share, $.30 per share on a comparable basis

--      Fourth quarter expected to show continued sequential improvement

Bausch & Lomb announced today the results of its operations for the third quarter, which ended September 29, 2001. Net sales during the period were $433.6 million, down 2% from the $443.2 million reported in the third quarter of 2000. In constant currency (excluding the impact of changes in foreign currency exchange rates), revenues were essentially flat with the prior year.

Net earnings were $23.3 million, or $.43 per share, compared to $14.7 million, or $.27 per share, reported for the third quarter of 2000. Reported results for the third quarter of this year included operating expense of $2.8 million before taxes, or $.03 per share, associated with the severance of the company's former chief executive officer. These results also included investment income of $14.1 million before taxes, or $.16 per share, from the sale of a portion of the company's equity position in Charles River Laboratories, Inc. Excluding these items, net earnings for the third quarter of 2001 were $16.0 million, or $.30 per share. Reported results for the third quarter of last year included restructuring and purchase accounting adjustments in the net amount of $22.8 million before taxes, or $.43 per share. Excluding these items, net earnings for the third quarter of 2000 were $37.8 million, or $.70 per share.

*   *   *

Commenting on the company's results, William H. Waltrip, Bausch & Lomb's chairman and chief executive officer, said, "While our performance continues to be affected by challenging economic conditions in the United States and Japan, our businesses in other markets are, in general, doing well. We're seeing indications that our decisive actions to reduce excessive retailer's inventories of lens care products and fix our product supply problems are having the desired effects. We will continue to focus on improving our operating execution in order to position Bausch & Lomb for a return to solid growth next year. And while we are not yet ready to provide more specific guidance on our future performance, we certainly expect that the fourth quarter of this year will show continued sequential improvement over this quarter."

73.     On November 9, 2001, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the October 18, 2001 earnings press release.  The Form 10-Q was signed by defendants Stiles and McCluski.

74.     On January 24, 2002, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces Fourth-Quarter 2001 Results." The earnings press release stated in relevant part:

> Net sales during the period were $452.0 million, down 3% from the $465.1 million reported in the fourth quarter of 2000. In constant dollars (excluding the impact of changes in foreign currency exchange rates), revenues declined 1% from the prior year. Full-year 2001 reported revenues were $1,711.9 million, down 3% from the $1,772.4 million reported in 2000. On a constant dollar basis, full-year revenues decreased 1%.

> For the fourth quarter the company reported a net loss of $8.0 million, or $0.15 per share, compared to a net loss of $5.0 million, or $0.09 per share, in the prior year's fourth quarter. Full-year 2001 reported net earnings were $21.2 million, or $0.39 per share, compared to $83.4 million, or $1.52 per share, in 2000.

> Reported earnings from continuing operations were $13.1 million, or $0.24 per share, in the fourth quarter of 2001 compared to a net loss from continuing operations of $6.4 million, or $0.12 per share, in the prior year. For the full year, reported earnings from continuing operations were $42.0 million, or $0.78 per share, as compared to $82.0 million, or $1.49 per share, in the prior year.

> *   *   *

> "The issues that drove 2001 performance can be addressed and we have begun that process," commented Zarrella. "Continued emphasis on reducing costs, improving execution through a more disciplined business process, and focusing on new technology products will all enable us to improve beyond the results we're reporting today."

Company Provides 2002 Outlook

> Bausch & Lomb provided investors with a general outlook for full-year 2002 comparable-basis results, indicating that it anticipates revenue growth in the mid-to-upper single digits. Expense savings from planned restructuring efforts are expected to yield operating margins of approximately 9%. Net financing expense is expected to increase, as lower interest rates will generate less investment income as compared to 2001. As a result, earnings per share are expected to be at or slightly above the current First Call consensus estimate.

75.     On March 22, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-K for FY:01 which repeated the Company's financial results disclosed in the January 24,

2002 earnings press release.  The Form 10-K was signed by defendants McCluski, Agnew, De Sole, Linen, McMullin, Purcell, Rice, Waltrip, Wolfe, Zarrella and Stiles.

76.     On April 25, 2002, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Announces First-Quarter 2002 Results." The earnings press release stated in relevant part:

--      Consolidated Revenues Increase 3% Over Prior Year

--      Comparable-Basis Earnings Per Share Increase $0.12, Including $0.08 Impact from Adoption of SFAS 142

--      Company Reaffirms Full-Year EPS and Revenue Expectations

Bausch & Lomb announced today the results of its operations for the first quarter ended March 30, 2002.

Reported Revenues and Net Income

Net sales during the period were $414.2 million, up 3% from the$402.6 million reported in the first quarter of 2001. In constant dollars (excluding the impact of changes in foreign currency exchange rates), revenues increased 5% from the prior year. For the first quarter the Company reported net earnings of $8.8 million, or $0.16 per share, compared to a net loss of $1.0 million, or $0.02 per share, in the prior-year period.

Impact of Change in Accounting for Goodwill

These results include an $0.08 per share earnings benefit from the Company's first-quarter 2002 adoption of Statement of Financial Accounting Standards (SFAS) No. 142 - Goodwill and Other Intangible Assets, under which it will no longer amortize goodwill recorded on its balance sheet. The Company had previously estimated the earnings benefit of this adoption to be approximately $0.35 per share for all of 2002. That amount has now been determined to be $0.33 per share. Had the adoption been made as of the beginning of 2001, prior-year first-quarter pro forma earnings per share would have increased by$0.09, to $0.07 per share.

*   *   *

"This quarter's results represent a good first step on our road to improved financial performance," commented Ronald L. Zarrella, Bausch & Lomb's chairman and chief executive officer. "We were particularly pleased with our comparable-basis operating earnings performance, which improved nearly 40% had goodwill been treated similarly in both years. But we still have work to do to achieve our three-year targets of upper-single digit revenue growth and mid-teen operating margins. With our continuing aggressive efforts to manage costs, the adoption of a more disciplined approach to the business, and strategic investments in growth opportunities, these goals should be attainable."

77.     On May 9, 2002, the Individual Defendants caused or allowed the Company to file a

Form 10-Q which repeated the Company's financial results disclosed in the April 25, 2002 earnings

press release.  The Form 10-Q was signed by defendants Stiles and McCluski.

78.     On July 25, 2002, the Individual Defendants caused or allowed the Company to issue

an earnings press release entitled "Bausch & Lomb Second-Quarter Profits Rise on Double-Digit

Sales Increase."  The earnings press release stated in relevant part:

--     Second-quarter revenues of $458.4 million increase 14% - Comparable-basis
       EPS of $0.40 improve $0.19 - Detailed plan outlined to reach three-year
       financial goals

       Bausch & Lomb today announced second-quarter worldwide sales of $458.4
       million - up 14% over the second quarter of 2001 - powered by double-digit
       increases in its contact lens, lens care and pharmaceutical product categories.
       Excluding the impact of currency, sales increased 13% for the quarter that ended
       June 29, 2002. For the first half of 2002, the Company reported worldwide sales of
       $872.6 million, up $68.4 million or 9% over sales in the first half of 2001.

       Bausch & Lomb also reported net earnings of $21.8 million and earnings per
       share of $0.40 for the second quarter. These results compare to prior-year reported
       earnings of $6.8 million, or $0.13 per share, and reflect new rules for accounting for
       goodwill amortization. If those rules were applied in 2001, comparable-basis
       earnings per share would have been $0.21 in the prior-year quarter.

       Calling the results "encouraging," Bausch & Lomb Chairman and CEO
       Ronald L. Zarrella said, "We are making progress in returning Bausch & Lomb to a
       stable and predictable company with improved profitability. Our new products are
       gaining momentum, our restructuring efforts are delivering savings and we continue
       to invest in new products and development opportunities to build future growth."

       Zarrella said that details of the Company's plan to improve operating
       profitability are outlined in a separate news release issued today. The plan includes
       actions expected to generate annualized pre-tax savings of approximately $90 million
       by 2005, with nearly 60% of those savings realized by 2004. Restructuring charges
       of up to $20 million before taxes associated with the plan will be recorded in the
       third quarter of 2002.

79.     On August 13, 2002, the Individual Defendants caused or allowed the Company to

file a Form 10-Q which repeated the Company's financial results disclosed in the July 25, 2002

earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.

80.     On October 17, 2002, the Individual Defendants caused or allowed the Company to

issue an earnings press release entitled "Bausch & Lomb Third-Quarter Results Driven by 11% Sales

Increase."  The earnings press release stated in relevant part:

--      Comparable-basis EPS of $0.48 improve $0.10 versus 2001

--      Company records net restructuring charges and asset write-offs of $25.5
        million before taxes

--      Company comfortable with current consensus EPS estimate of $0.55 for
        fourth-quarter and targets full-year 2003 comparable-basis EPS growth of
        approximately 20 percent

        Bausch & Lomb today announced that third-quarter worldwide sales of
$466.7 million increased 11% over the third quarter of 2001.

        Double-digit increases in the company's pharmaceuticals, contact lens and
lens care categories drove these overall results, while the company also posted mid-
single digit revenue increases for cataract surgery products and essentially flat
performance for its refractive surgery category. Excluding the favorable impact of
currency, sales increased 9% for the quarter that ended September 28, 2002. For the
first nine months of 2002, the company reported worldwide sales of $1.339 billion, up
$115.7 million or 9% over 2001, with currency having no impact on year-over-year
results.

        Bausch & Lomb also reported net earnings of $9.4 million and earnings per
share of $0.17 for the third quarter. These results compare to prior-year reported
earnings of $23.3 million, or $0.43 per share. Both periods reflect the impact of non-
recurring items. Excluding such items, comparable-basis earnings per share were
$26.1 million or $0.48 per share in the third quarter of 2002 as compared to $20.5
million or $0.38 per share in the prior-year period.

        "Our results this quarter exhibit continued solid progress toward improving
operational performance," said Bausch & Lomb's Chief Executive Officer, Ronald L.
Zarrella. "As we execute on our plans to reduce costs and operate with a more
disciplined business approach, we are establishing good momentum toward
achieving our three-year financial targets."

81.     On November 1, 2002, the Individual Defendants caused or allowed the Company to

file a Form 10-Q which repeated the Company's financial results disclosed in the October 17, 2002

earnings press release.  Further, the Form 10-Q was certified under section 906 of the Sarbanes-

Oxley Act of 2002 by defendants Zarrella and McCluski.  The certifications stated in part:

        [T]he Quarterly Report on Form 10-Q of the Company for the quarterly period ended
        September 28, 2002 as filed with the Securities and Exchange Commission on the
        date hereof (the "Report") fully complies with the requirements of Section 13(a) or
        15(d) of the Securities Exchange Act of 1934; and the information contained in the

Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

82.     On January 30, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Bausch & Lomb Comparable-Basis Fourth Quarter Profits Rise 30% on 8% Sales Gain."  The earnings release stated in relevant part:

--      EPS of $0.60 improve $0.14 over prior-year comparable-basis figures - Liquidity further strengthened through new $400 million five-year revolving credit agreement - Company projects mid-single-digit revenue growth and comparable-basis EPS of approximately $2.05 in 2003

Bausch & Lomb today reported fourth-quarter worldwide sales of $477.4 million, an increase over the prior-year quarter of $35.5 million or 8%. The continued positive performance was powered by gains in the company's contact lens, pharmaceuticals and lens care product categories, as well as a 3% favorable impact from foreign currency. For the full year, Bausch & Lomb reported worldwide sales of $1.817 billion, up 9% over 2001, including a 1% benefit from currency.

The company's fourth-quarter reported net earnings were $32.4 million, or $0.60 per share, compared to a reported net loss of $8.0 million, or $0.15 per share, in 2001. The prior-year period amounts include certain non-recurring items and an adjustment to gain on sale of a previously discontinued operation. Excluding these items, comparable-basis fourth-quarter 2001 earnings per share were $0.46.

For the full year, reported net earnings were $72.5 million, or $1.34 per share in 2002 compared to $21.2 million, or $0.39 per share, in 2001. Excluding non-recurring items from both periods, and discontinued operations from 2001 results, comparable-basis earnings per share were $1.73 in 2002 compared to $1.24 in 2001.

"I am pleased to report that 2002 was a year of improving operational execution and the beginning of the turnaround in our company, as we promised it would be," said Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella. "We posted solid top- and bottom-line growth with improved margins and we are well positioned to continue that momentum into 2003."

83.     On March 21, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-K for FY:02 which repeated the Company's financial results disclosed in the January 30, 2003 earnings press release.  The Form 10-K was signed by defendants McCluski, Agnew, De Sole, Linen, McMullin, Purcell, Rice, Waltrip, Wilson, Wolfe, Zarrella and Stiles.  Further, the Form 10-K was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.  The certifications were similar to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002.

84.     On April 24, 2003, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb First-Quarter Revenues Rise 8%, Generating $0.31 EPS from Continuing Operations." The earnings press release stated in relevant part:

--      Comparable-basis earnings per share from continuing operations improve 29% over 2002

--      Profitability improvement plan on target; comparable-basis operating earnings up 43%

Bausch & Lomb  today reported first-quarter worldwide sales of $448.0 million, an increase of $33.8 million or 8 percent over the prior-year first quarter.

A 7-percent benefit from the strengthening of foreign currencies against the U.S. dollar augmented underlying fundamental growth in the Company's lines of contact lenses, pharmaceuticals and cataract surgery products.

Reported net earnings from continuing operations were $16.5 million, or $0.31 per share, an increase of 29 percent over the comparable-basis prior-year amount of $0.24 per share. Total 2003 first-quarter reported earnings of $15.6 million, or $0.29 per share, reflected a $0.02 per share cumulative impact from adopting Statement of Financial Standards No. 143, Accounting for Asset Retirement Obligations, as of the beginning of the year. First-quarter 2002 reported earnings of $8.8 million or $0.16 per share included certain non-recurring items, discussed below, which totaled $0.08 per share.

Commenting on today's announcement, Bausch & Lomb Chief Executive Officer Ronald L. Zarrella said, "We are pleased with the results we posted today. From an operational perspective, they were in line with our internal goals, and represented the fifth consecutive quarter we've met or exceeded performance expectations. Importantly, our profitability improvement program continues to progress, and was a major factor behind the 43-percent improvement in comparable-basis operating earnings in the quarter."

*   *   *

"We are pleased with the progress we are making in strengthening our balance sheet and overall liquidity position," said Bausch & Lomb Chief Financial Officer Stephen C. McCluski. "We continue to focus our attention on accounts receivable and inventory management, and we made progress on both fronts this quarter, with both days sales outstanding and inventory months-on-hand improved as compared to the first quarter of 2002 and ahead of our internal expectations."

85.     On May 9, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the April 24, 2003 earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.  Further, the Form

10-Q was certified under section 906 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and

McCluski.  The certifications were identical to the certifications made by defendants Zarrella and

McCluski to the Company's Form 10-Q filed on November 1, 2002.

86.     On July 24, 2003, the Individual Defendants caused or allowed the Company to issue

an earnings press release entitled "Bausch & Lomb Second-Quarter Earnings Per Share Increase 33

Percent on 12 Percent Sales Gain."  The earnings press release stated in relevant part:

--      Company increases full-year EPS guidance to $2.20 per share on expected
        continued strength in business fundamentals and continued favorable
        currency environment

        Bausch & Lomb today reported earnings per share of $0.53 for the quarter
        ended June 28, 2003, representing a 33 percent increase over the $0.40 per share
        reported in the prior-year period. Worldwide sales of $512.5 million grew 12 percent
        (or four percent on a constant-currency basis) over the $458.4 million reported in
        2002.

        First-half 2003 net sales were $960.5 million, an increase of $87.9 million or
        ten percent over the same 2002 period, and a three percent increase excluding
        currency. Earnings per share from continuing operations were $0.84, compared to
        $0.57 in 2002, which included the impact of restructuring charges and other non-
        recurring items. Excluding these items, comparable first-half 2002 earnings per share
        from continuing operations were $0.65.

        Calling the Company's second-quarter performance "solid," Bausch & Lomb
        Chief Executive Officer Ronald L. Zarrella said, "The financial results we announced
        today were slightly ahead of our expectations on a currency-neutral basis, with sales
        gains generated in nearly every product category, and despite the negative impact of
        the SARS outbreak. We estimate that our constant-currency growth would have been
        between five and six percent were it not for SARS." Zarrella continued, "Our
        profitability improvement programs remain on or ahead of schedule, and were a
        major factor behind our improved gross margins this quarter. We continue to believe
        we will attain the expected savings from these programs and achieve our previously
        communicated longer-term financial targets."

        Bausch & Lomb also indicated that it expects full-year 2003 sales growth and
        earnings per share to be higher than previously communicated. Zarrella commented,
        "We expect the positive business trends to continue over the remainder of the year,
        particularly in our contact lens and pharmaceuticals categories, and to generate mid-
        single-digit constant-currency growth for the full year. Although there may be some
        lingering effects from the SARS outbreak in the third quarter, we believe that the
        most significant impact is behind us. Further, the foreign exchange rate assumptions
        used to develop our original guidance have proven to be conservative through the
        first six months of the year. Taking all of these factors into account, we now project
        full-year reported revenue growth approaching ten percent and earnings per share of
        approximately $2.20."

87.     On August 7, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the July 24, 2003 earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.  Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.   The 906 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002. Defendants Zarrella and McCluski's 302 certifications of the Sarbanes-Oxley Act of 2002 stated in relevant part:

> Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

> Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

88.     On October 30, 2003, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Posts Third-Quarter Earnings Per Share of $0.60 on Nine Percent Sales Gain."  The earnings press release stated in relevant part:

--      Sales grow five percent excluding impact of currency

--      Comparable-basis EPS increase 25 percent

--      Company comments on expectations for fourth quarter and for 2004

> Bausch & Lomb today reported earnings per share of $0.60 for the quarter ended September 27, 2003, compared to $0.17 per share reported in the prior-year period. Worldwide sales of $508.8 million grew nine percent (or five percent on a constant-currency basis) over the $466.7 million reported in 2002.

> The prior-year period earnings per share included certain non-recurring items discussed below. Excluding such items, comparable-basis earnings per share were $0.48 in 2002.

> For the first nine months of 2003, net sales were $1.47 billion, an increase of $130.0 million or 10 percent over the prior year, and a three percent increase on a constant-currency basis. Earnings per share from continuing operations were $1.44, compared to $0.74 in 2002. Excluding the impact of non-recurring items, comparable-basis 2002 earnings per share from continuing operations were $1.13.

Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella said, "We are pleased with the positive momentum in our Company's financial performance. Our third-quarter results demonstrated sustained solid growth in the majority of our businesses, combined with continued progress in executing our cost-saving initiatives as well as a favorable currency environment. Based on our expectation that underlying trends will continue, we foresee comparable-basis fourth-quarter earnings per share of approximately $0.79." Zarrella continued, "Looking ahead to next year, our revenues should grow in the mid-single digits. Additional savings from ongoing profitability initiatives, combined with lower interest expense following the recent refinancing of debt, should yield 2004 earnings per share in the range of $2.50 to $2.60."

89.     On November 6, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the October 30, 2003 earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.  Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.  The 906 and 302 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

90.     On January 29, 2004, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Fourth-Quarter Sales Up 15 Percent, Comparable-Basis EPS Rise 38 Percent." The earnings press release stated in relevant part:

Bausch & Lomb today reported worldwide sales of $550.1 million in the fourth quarter ended December 27, 2003, an increase of 15 percent (or seven percent on a constant-currency basis) over the $477.4 million reported in the prior-year period.  GAAP earnings per share were $0.92 in 2003, compared to $0.60 in the year-ago quarter.   Excluding certain non-recurring items discussed below, comparable-basis earnings per share in the 2003 fourth quarter were $0.83, a 38 percent increase over 2002.

Full-year 2003 net sales were $2.02 billion, up $202.8 million or 11 percent from 2002, and up four percent on a constant-currency basis.  GAAP earnings per share from continuing operations were $2.36, compared to $1.34 in 2002. Comparable-basis net earnings from continuing operations were $2.27 in 2003, up 31 percent from $1.73 in 2002.

Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella said, "We are very satisfied with our 2003 financial results, which were in line with our expectations for mid-single-digit constant-currency revenue growth and margin expansion from our profitability improvement programs.  In the end, the cost savings delivered by those programs surpassed our initial expectations and foreign currency worked to our benefit, resulting in bottom-line results ahead of our original thinking.

We have now posted two solid years of improved financial performance, and look forward to building on that in 2004 and beyond."

91.     On March 8, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-K for FY:03 which repeated the Company's financial results disclosed in the January 29, 2004 earnings press release.  The Form 10-K was signed by defendants McCluski, Agnew, De Sole, Linen, McMullin, Purcell, Rice, Waltrip, Wilson, Wolfe, Zarrella and Stiles.  Further, the Form 10-K was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.  The certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

92.     On April 21, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Bausch & Lomb First-Quarter Earnings Per Share Rise 39 Percent on 14 Percent Higher Revenues."  The press release stated in relevant part:

--      Sales grow six percent excluding currency benefits

--      First-quarter earnings per share of $0.43 compare to $0.31 earnings per share from continuing operations in 2003

--      ***Company raises full-year earnings per share guidance to $0.10 to $2.70 to $2.75***

Bausch & Lomb today reported worldwide sales of $510.3 million for its first quarter ended March 27, 2004, an increase of 14 percent (or six percent on a constant-currency basis) over the $448.0 million reported in the first quarter of 2003. Constant-currency sales growth was reported in the Company's contact lens, pharmaceuticals, refractive surgery and lens care categories, with a slight decline reported for cataract surgery products.

Net earnings per share were $0.43 in the first quarter of 2004, compared to earnings per share from continuing operations of $0.31 in 2003 and net earnings per share of $0.29, which reflected a $0.02 per share cumulative impact from adopting a new accounting principle.

Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella said, "Our first-quarter results were solid, with constant-currency sales growth in line with, and operating margins somewhat above, our original projections.  These operational factors generated about half the earnings per share upside as compared to our previous guidance, with the rest coming from lower-than-anticipated net financing expense." Zarrella continued, "We remain comfortable with our projections for full-year 2004 constant-currency revenue growth in the mid-single digits and expect full-year operating margins above 12 percent, reflecting leverage from favorable mix shifts and continuing benefits from our profitability improvement

programs. Combined with the results reported today, those trends should result in earnings per share in the range of $2.70 to $2.75 for the year, assuming currency rates remain relatively consistent with current levels."

93.    On May 4, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the April 21, 2004 earnings press release. The Form 10-Q was signed by defendants Zarrella and McCluski. Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski. The 906 and 302 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

94.    On July 29, 2004, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Reports 43 Percent Second-Quarter Earnings Per Share Growth on 11 Percent Sales Gain." The earnings press release stated in relevant part:

--     Worldwide revenues grow eight percent excluding currency effects

--     Second-quarter earnings per share were $0.76, compared to $0.53 in 2003

--     Company increases full-year earnings per share guidance to between $2.80 and $2.85

Bausch & Lomb today reported worldwide sales of $566.5 million for the quarter ended June 26, 2004, an 11 percent increase (or growth of eight percent on a constant-currency basis) over the prior-year period. Each of the Company's product categories reported solid sales growth.

Earnings per share of $0.76 grew 43 percent as compared to the $0.53 per share reported in the prior-year period. Operating margins of 13.3 percent of sales increased from 11 percent of sales in the prior year, reflecting improved gross margins and lower operating expenses as a percentage of sales.

*   *   *

Commenting on second-quarter financial performance, Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella said, "We are pleased with the solid results we reported today, which demonstrate our continued progress toward our established financial goals. Just as important, we're starting to see the top-line contributions from recent product introductions. With more of those in the pipeline, we have good reason to be optimistic about our future growth prospects."

Bausch & Lomb indicated that it is now projecting full-year earnings per share to be in the range of $2.80 to $2.85. Previous guidance had been in the range

of $2.70 to $2.75 per share.  Zarrella commented, "The increased guidance reflects our current expectation for full-year constant-currency revenue growth of six to seven percent, with reported revenue growth in the low double digits if exchange rates remain where they are today.

95.     On August 3, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the July 29, 2004 earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.  Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.  The 906 and 302 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

96.     On October 20, 2004, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Earnings Per Share Up 32 Percent on Eight Percent Higher Sales."  The earnings press release stated in part:

--      Worldwide revenues grow four percent excluding currency effects

--      Third-quarter earnings per share were $0.79, compared to $0.60 in 2003

--      Company expects full-year 2004 earnings per share between $2.85 and $2.90, growing to between $3.30 and $3.40 in 2005

Bausch & Lomb today reported worldwide sales of $548.9 million for the quarter ended September 25, 2004, an eight percent increase (or growth of four percent on a constant-currency basis) over the prior-year period.  Sales gains were reported in each of the company's geographic business segments and in all product categories except lens care.

Earnings per share of $0.79 grew 32 percent as compared to the $0.60 per share reported a year ago.  Operating margins were 14 percent of sales in the third quarter, compared to 12 percent in the prior year.

*   *   *

*The company indicated that it now expects full-year 2004 constant-currency revenue growth of approximately six percent, translating to reported growth of between nine and ten percent, should exchange rates remain where they are today.  Earnings per share are now forecast at between $2.85 and $2.90 per share, up from previous expectations of between $2.80 and $2.85 per share.  For 2005, the company projects constant-currency revenue growth of between six and seven percent, yielding earnings per share between $3.30 and $3.40.*

* * *

*"Given the leverage opportunities within our current structure, we are confident in our ability to achieve the 2005 earnings targets we set forth today*."

97.     On November 1, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the October 20, 2004 earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.  Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.  The 906 and 302 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

98.     On January 27, 2005, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb's 2004 Revenues Grow 11 Percent, Generating $2.93 Earnings Per Share."  The earnings press release stated in relevant part:

--      Full-year revenues grow six percent excluding currency benefits

--      Full-year comparable-basis EPS rise 29 percent from 2003

--      Company expects constant-currency revenues to grow six to seven percent in 2005, with earnings per share at the high end of previous guidance

        Bausch & Lomb today reported results for its full year and fourth quarter ended December 25, 2004.

Full-Year Results

        Full-year worldwide net sales of $2.23 billion increased 11 percent from $2.02 billion in 2003, and were up six percent excluding the positive benefit of changes in foreign currency exchange rates.  Growth was reported for all product categories in each geographic segment.

        Full-year GAAP earnings per share were $2.93 in 2004.  In 2003, GAAP earnings per share were $2.34 and included certain significant items as well as the cumulative effect of a change in accounting principle.  Excluding those items, 2004 earnings per share increased 29 percent on a comparable-basis from 2003.

        Full-year comparable-basis operating margins increased to 12.5 percent of sales in 2004 from 11.6 percent of sales in the prior year.  Gross margins expanded to 58.1 percent of sales from 57.5 percent of sales in 2003.  This improvement, combined with lower selling, general and administrative expenses as a percentage of sales, was partially offset by higher investment in research and development.  For the

full year, comparable-basis research and development expense increased 13 percent to $162.5 million, or 7.3 percent of sales.

Fourth-Quarter Results

Fourth-quarter net sales of $606.6 million represented a 10 percent increase (or growth of seven percent on a constant-currency basis) over the prior-year period. Gains were reported in every product category in each of the Company's geographic business segments except for an anticipated decline in sales from refractive surgery products in the Americas region.

Fourth-quarter GAAP earnings per share were $0.94. In 2003, fourth-quarter GAAP earnings per share of $0.92 included certain significant items. Excluding those items, earnings per share increased 13 percent on a comparable basis in 2004.

\* \* \*

*"We are very pleased with the strong results reported for both the fourth quarter and all of 2004, which clearly demonstrate that the Company is beyond the turnaround stage," said Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella. "Led by improved operational performance, we surpassed the earnings per share expectations we established at the beginning of the year and exited 2004 with increased momentum. We are well positioned for accelerated sales growth and continued strong financial performance in 2005."*

99. On March 9, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-K for FY:04 which repeated the Company's financial results disclosed in the January 27, 2005 earnings press release. The Form 10-K was signed by defendants McCluski, Bennett, De Sole, Friedman, Linen, McMullin, Purcell, Rice, Waltrip, Wilson, Wolfe, Zarrella and Stiles. Further, the Form 10-K was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski. The certifications were similar to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

100. On April 19, 2005, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Reports Solid First Quarter." The press release stated in relevant part:

--      Earnings Per Share Up 47 Percent on Nine Percent Sales Gain

--      Company Raises Full-Year EPS Guidance Five Cents to $3.45

Bausch & Lomb today released results for the first quarter ended March 26, 2005.  Total reported sales of $554.3 million increased nine percent over the $510.3 million reported in the first quarter of 2004, or six percent on a constant-currency basis.  The Company's lens care category led sales growth, increasing 13 percent in the quarter (11 percent in constant currency), primarily reflecting the timing of a significant order from a major U.S. retail customer.

First-quarter earnings per share rose 47 percent to $0.63, compared to $0.43 a year ago, reflecting a favorable sales mix due to the strong lens care performance, partially offset by increased investment in research and development, and higher selling, general and administrative expenses.

\* \* \*

"This was a solid first quarter," said Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella.  "Strong overall operating performance generated about three cents of earnings upside compared to our expectations.  That was augmented by the earnings impact from higher-than-anticipated lens care sales. While the majority of the lens care upside was associated with the timing of a major customer promotion that shifted sales from the second quarter to the first, we believe some of it was incremental to our previous expectations.  As a result, we have increased full-year EPS guidance from $3.40 to $3.45."

101.    On April 28, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the April 19, 2005 earnings press release.  The Form 10-Q was signed by defendants Zarrella and McCluski.  Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski.  The 906 and 302 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

102.    On July 27, 2005, the Individual Defendants caused the Company to issue an earnings press release entitled "Bausch & Lomb Earns 81 Cents Per Share on Seven-Percent Sales Gain." The earnings press release stated in relevant part:

--      Company increases full-year guidance by five cents

--      Board of Directors approves additional share repurchase

--      Company finalizes plans to repatriate offshore funds

Bausch & Lomb today reported results for its second quarter ended June 25, 2005. Worldwide net sales of $608.3 million increased seven percent from $566.5 million in the 2004 period, and were up five percent on a constant-currency basis.

Gains were reported in each of the Company's geographic segments and product categories. Earnings per share of $0.81 increased seven percent from 2004.

\*   \*   \*

"We were very satisfied with our second-quarter performance," said Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella, "and from an earnings perspective, first-half results were a bit ahead of our expectations. Given our performance to date, and recognizing that new products and further share gains are expected to accelerate top-line growth in the second half of 2005, we have upwardly revised our outlook for the full year."

103.    On July 28, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q which repeated the Company's financial results disclosed in the July 27, 2005 earnings press release. The Form 10-Q was signed by defendants Zarrella and McCluski. Further, the Form 10-Q was certified under sections 906 and 302 of the Sarbanes-Oxley Act of 2002 by defendants Zarrella and McCluski. The 906 and 302 certifications were identical to the certifications made by defendants Zarrella and McCluski to the Company's Form 10-Q filed on November 1, 2002 and August 7, 2003.

104.    On October 26, 2005, the Individual Defendants caused or allowed the Company to issue an earnings press release entitled "Bausch & Lomb Reports Preliminary Third-Quarter Results." The earnings press release stated in part:

> **Bausch & Lomb today reported preliminary results of operations for the third quarter and nine months ended September 24, 2005, and said it may delay the filing of its Quarterly Report on Form 10-Q, which is due on November 3, 2005, pending the results of an investigation, described below, into allegations of improper conduct by management of the Company's Brazilian subsidiary, BL Industria Otica, Ltda. ("BLIO"), and past tax assessments against BLIO by Brazilian taxing authorities. BLIO manufactures contact lenses and markets a range of the Company's vision care, surgical and pharmaceutical products in Brazil.** In 2004 BLIO accounted for approximately $20 million in net sales, which is less than one percent of Bausch & Lomb's consolidated revenues.

\*   \*   \*

Bausch & Lomb Chairman and Chief Executive Officer Ronald L. Zarrella said, "The underlying improvement in our fundamental operating performance in the quarter continues to demonstrate how we are leveraging sales gains into even higher earnings growth, notwithstanding the various discrete items and the charges that were recorded as a result of the ongoing investigation in Brazil."

## THE TRUTH IS REVEALED

105.    On October 26, 2005, *Bloomberg* published an article entitled "Bausch  & Lomb

May Delay Filing Amid Brazil Inquiry."  The article stated in relevant part:

> Bausch & Lomb Inc., the world's fourth-largest maker of contact lenses, said it may delay filing its fiscal third-quarter results, due Nov. 3, pending an investigation into the management at a Brazilian unit.
>
> An audit committee found the general manager, controller and other employees of BL Industria Otica didn't properly account for about $600,000 in expenses for an unauthorized pension plan, Rochester, New York-based Bausch & Lomb said today in a preliminary earnings statement.
>
> ***Bausch & Lomb said the U.S. Securities and Exchange Commission is conducting an informal inquiry into the matter. Brazilian tax authorities have also said the unit owes $5 million in taxes and $21 million in penalties. The company had third-quarter costs of $19.6 million, or 35 cents, related to the Brazilian investigation.***
>
> The third-quarter 10-Q filing may be delayed until the audit committee's investigation is finished and its accounting firm, Pricewaterhouse Coopers, can prepare the financial statements.
>
> Restatement of previous financial statements may be necessary, Bausch & Lomb said.

106.    On December 22, 2005, after the markets closed, the Individual Defendants caused or

allowed the Company to provide an update on an internal investigation related to its Brazilian

subsidiary and to announce that it would restate its financial results for FY:00 through the first half

of FY:05.  The Company concluded, based on the investigation, that certain prior-period financial

statements would be required to be restated. In addition, the Company preliminarily identified a

material weakness in its controls over financial reporting relating to detection and prevention of local

management's fraudulent override of Brazil tax reporting controls. ***Bausch & Lomb also announced***

***that the Audit Committee of its Board of Directors had commenced an independent investigation***

***into revenue recognition practices in its Korean subsidiary***.

107.    The December 22 press release further stated:

> As described in the October 26 release, in September of 2005, the Audit Committee of the Board of Directors commenced an independent investigation into allegations of misconduct by the management of BLIO, which had been reported to the Company's senior management by a BLIO employee pursuant to the Company's

established compliance program. The Audit Committee engaged the law firm of Cahill Gordon & Reindel LLP to assist with the investigation. Bausch & Lomb also voluntarily reported these matters to the staff of the Northeast Regional Office of the Securities and Exchange Commission, which commenced an informal inquiry into the matter.

\* \* \*

Also as a result of the Audit Committee's investigation, it was learned that certain Brazilian tax authorities have made tax assessments relating to or arising from Brazilian VAT, social contribution, income and certain import-related taxes against BLIO for unpaid taxes totaling approximately $5 million, interest of approximately $7 million, plus approximately $21 million in claimed penalties which relate back to various earlier periods. These assessments include approximately $19 million in penalties arising from tax-credit transactions involving BLIO and third parties, alleged by Brazilian tax authorities to have been fraudulently structured and implemented. Appropriate reserves relating to these assessments were not reflected by BLIO in its subsidiary financial statements, as required by the Company's established policies and procedures. In its October 26 release, the Company indicated that, based on its assessments, in consultation with outside tax counsel, of the outstanding Brazil tax matters, it was recording a reserve in the Company's third quarter financial statement of approximately $22 million, yielding an after-tax charge of $19.6 million. The Company also cautioned in the October 26 release that there could be no assurance that the reserve for these tax matters would not be required to be materially increased or recorded in a different period.

\* \* \*

*The Company expects to restate its financial results for the fiscal years ended 2000, 2001, 2002, 2003, 2004, as well as the first and second quarters of 2005. Accordingly, the financial statements contained in the following Company filings with the Securities and Exchange Commission should no longer be relied upon*:

-- Annual Report on Form 10-K for the year ended December 25, 2004;

-- Quarterly Report on Form 10-Q for the quarterly period ended March 26, 2005; and

-- Quarterly Report on Form 10-Q for the quarterly period ended June 25, 2005

108. In response to these revelations, the Company's shares plummeted 15% from $79.07 to $67.20 per share over the following trading days. Over $624 million of the Company's market capitalization was erased between December 22, 2005 and December 29, 2005.

109. On January 27, 2006, the *Rochester Democrat and Chronicle* published an article entitled "Bausch & Lomb Again Hits Sag Abroad; Financial Report Delayed as Company Awaits Results of Probe at South Korean Unit." The article stated in relevant part:

For the second time in three months, potential problems at a foreign subsidiary are forcing Bausch & Lomb Inc. to take a longer look at its financial statements.

*Last month, B&L concluded that managers at its Brazilian unit had manipulated its books to fund an illegal pension and owed several million dollars in unpaid taxes.*

The revelation prompted B&L to restate earnings for several financial periods dating back to 2000.

*Now, potential problems at a subsidiary in South Korea could have an additional impact on B&L's financial results.*

B&L said Thursday that it would hold off on announcing fourth-quarter and full-year financial results for at least one month to await the results of a probe into sales practices at the South Korean unit.

\* \* \*

The problems in Brazil and Korea have also prolonged the company's delay in submitting its third-quarter 10-Q report, a mandatory financial statement that the company originally planned to file with the Securities and Exchange Commission by Nov. 30.

B&L said, however, that the SEC is aware of the company's investigations and filing delays.

"This investigation was voluntarily reported to the Northeast regional office of the (SEC)," said company spokesman Clinton Lewis. "The company's counsel is keeping the SEC up-to-date on the process of the investigation."

SEC spokesman John Heine said he did not know details about B&L's situation, nor would he elaborate on any penalties that could be levied or how often corporations have been late in submitting financial reports.

\* \* \*

On Wall Street*, this and previous announcements of B&L's filing delays and investigations in recent months have significantly hampered growth in the company's share value,* which was otherwise boosted by healthy financial results that had consistently beaten Wall Street estimates. For example, after the restatement announcement Dec. 23, company stock fell 9 percent.

## REASONS THE STATEMENTS WERE IMPROPER

110.    The true facts, which were known or should have been known by each of the

Individual Defendants but concealed from the investing public and the Company's shareholders

during the Relevant Period, were as follows:

(a)      the Company was materially overstating its financial results by improperly accounting for expenses and taxes by its subsidiary, BLIO, among other things.  Bausch & Lomb has restated its financial statements for FY:00 through FY:04, and for the first and second quarters of FY:05;

(b)      the Company had accounting issues in South Korea;

(c)      the Company had engaged in improper sales practices at its Spanish subsidiary which subjected it to potential violations of the U.S. Foreign Corrupt Practices Act;

(d)      the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and

(e)      as a result of the foregoing, the values of the Company's net income and funds from operations were materially overstated at all relevant times.

## THE RESTATEMENT

111.    On February 7, 2007, just three months before it announced the Warburg Merger, Bausch & Lomb finally completed its financial restatement and filed its Annual Report on Form 10-K for the year ended December 31, 2005.  According to the Company, the restatement corrects errors made: (i) in the application of GAAP, including revenue recognition, accounting for reserves and accounting for foreign currency adjustments; (ii) accounting for income taxes, including income taxes payable, tax reserves, deferred income tax assets and liabilities, related valuation allowances and income tax expense; and (iii) the accounting for the Company's Long-Term Deferred Compensation Plan.  Specifically, the  Form 10-K for FY:05 stated:

> As previously disclosed in our Notification of Late Filings on Form 12b-25 with the Securities and Exchange Commission (SEC) on March 17, 2006, May 11, 2006, August 8, 2006 and November 9, 2006, we were unable to file this Annual Report on Form 10-K on a timely basis due to ongoing independent investigations conducted by the Audit Committee of our Board of Directors; expanded year-end procedures that were not complete; expanded procedures with respect to the accounting for income taxes that were not complete; and continued efforts to complete our assessment of our internal control over financial reporting. ***Our review and evaluation of internal***

*control over financial reporting concluded that we did not maintain effective internal control over financial reporting as of December 31, 2005*.

As a result of the Audit Committee's investigation and the expanded year-end procedures and expanded procedures with respect to the accounting for income taxes, we identified errors made in the application of generally accepted accounting principles (GAAP) that impacted previously reported financial statements. *Consequently, management determined that our previously issued consolidated financial statements for fiscal years 2003 and 2004 and our financial information for the years ended 2001 and 2002 (including a cumulative increase to 2001 beginning retained earnings of $34) and the first and second quarters of 2005 should be restated to correct for such errors and departures from GAAP.* The restated financial statements contained in this Annual Report on Form 10-K contain a number of adjustments associated with revenue recognition, accounting for reserves, accounting for foreign currency adjustments, accounting for income taxes including income taxes payable, tax reserves, deferred income tax assets and liabilities, related valuation allowances and income tax expense, and the accounting for the Company's Long-Term Deferred Compensation Plan.

\* \* \*

**Brazil Matters**  In September 2005, the Audit Committee of the Board of Directors commenced an independent investigation into allegations of misconduct by the management of the Company's Brazilian subsidiary, BL Industria Otica, Ltda. (BLIO), which had been reported to the Company's senior management by a BLIO employee pursuant to the Company's established compliance program.  The Company also voluntarily reported these matters to the staff of the Northeast Regional Office of the SEC, which has commenced an informal inquiry.  In connection with the Audit Committee investigation of the BLIO matters, the Company learned that the general manager, the controller and other employees of BLIO, in violation of Company policies, engaged in improper management and accounting practices. The Company also learned certain Brazilian tax authorities had made tax assessments relating to or arising from Brazilian VAT, social contribution, income and certain import-related taxes against BLIO for a total of approximately $33.0 in unpaid taxes, interest and penalties which relate back to various earlier periods.  Appropriate reserves relating to these assessments were not reflected by BLIO in its subsidiary financial statements, as required by the Company's established policies and procedures.  In addition, the Company learned that BLIO had failed to comply with certain local payroll tax obligations and also mischaracterized approximately $0.6 in expenses to fund an approximately $1.5, unauthorized local pension arrangement for the benefit of the general manager, the controller and other members of local management.  The Company conducted a further review of these tax matters, and determined that cumulative after-tax charges in periods prior to 2003 through the first half of 2005 of $27.8 were appropriate.  The majority of these charges related to and were recorded in 2001, 2002 and 2003.  In October 2006, the Company applied for and expects to be granted amnesty from the state government of Sao Paulo, Brazil as to a portion of the penalties and interest associated with one such assessment.  As a result, the Company expects to reverse approximately $20 of approximately $27 of penalties and interest expense that were recorded as part of the

financial restatement upon formal notification of cancellation by the state government of Sao Paulo, Brazil.

**Asia and Other Revenue Recognition Matters**

In late November 2005, following employee reports regarding improper sales practices at the Company's Korean vision care joint venture, BL Korea, the Audit Committee commenced an independent investigation into revenue recognition practices at BL Korea and engaged an outside law firm to assist with the investigation. The investigation was voluntarily reported to the Northeast Regional Office of the SEC. As a result of the Audit Committee's independent investigation, the Company determined that from 2002 to 2005 sales management at BL Korea, in violation of the Company's policies, engaged in improper vision care-related sales practices including, at various times, granting customers improper rights to return product, facilitating product exchanges between customers without properly accounting for such exchanges, failing to properly process product returns and granting excessive credit. As a result of these sales practices which violated Company policies, risk of loss of the product did not properly transfer to customers. The Company has determined that pursuant to GAAP, all BL Korea vision care transaction during this period should be recorded as consignment sales.

In light of the investigations of the Company's Brazil and Korea subsidiaries, the Company undertook expanded year-end procedures focused on, among other things, revenue recognition and sales practices at certain other subsidiaries. As a result of these procedures, the Company determined that it did not maintain effective controls over certain subsidiaries' relationships with their key distributors, particularly in the Company's Japan and India subsidiaries, and did not maintain effective controls over the installation of refractive laser surgery equipment in multiple locations where the Company does business, to ensure that revenue associated with such distributor and laser sales was recognized in accordance with GAAP. Specifically, the Company determined that the customer arrangements were not adequately reviewed by the appropriate persons at such subsidiaries to identify and provide reasonable assurance regarding the proper application of the appropriate method of revenue recognition. In addition, the Company determined that it did not maintain effective controls to prevent subsidiary management from overriding established financial controls or making errors in the application of policies concerning the accuracy and valuation of accounts receivable and the maintenance of distributor inventory at established threshold levels, as well as regarding administration of credit limits, extension of credit terms, price discounting, sales returns and exchanges, transfer of the risk of ownership, and sales order entry and control. The Company's restatement of prior-period financial statements includes additional adjustments relating to revenue recognition for the following matters: the BL Korea vision care sales discussed previously; certain refractive laser sales; certain vision care transactions with a single distributor in Thailand; vision care transactions with two large distributors in Japan; vision care and cataract transactions with the distributor network in India; and the improper handling of certain sales related reserves in China. Of these adjustments, the largest relates to the vision care transactions in Japan which reduced net sales in periods prior to 2003 through the

first six months of 2005 by a cumulative total of $12.3 and reduced net earnings by a cumulative total of $5.3. The revenue recognition adjustments for vision care sales in Korea from periods prior to 2003 through the first half of 2005 reduced net sales by a cumulative total of $8.4 and reduced net earnings by a cumulative total of $3.3. All other revenue recognition matter adjustments prior to 2003 through the first six months of 2005 in the aggregate reduced net sales by a cumulative total of $6.7 and reduced net earnings by a cumulative total of $2.5.

**Tax Matters**  In 2005, the Company undertook a comprehensive review of its accounting for income taxes. As a result, the Company's restatement of prior-period financial statements includes adjustments from periods prior to 2003 through the first six months of 2005 that reduce net earnings by $2.1. These adjustments related primarily to the Company's determination of deferred income tax assets and liabilities. The most significant adjustment related to the recognition of deferred tax liabilities for outside basis differences in foreign subsidiaries where the earnings of such subsidiaries are not permanently re-invested. This adjustment reduced net earnings by $27.8, the majority of which was recorded prior to 2003. The Company also determined that it had not properly reconciled the tax effects of differences between its financial reporting and tax-based balance sheets to the reported deferred tax assets and liabilities. This adjustment increased net earnings for periods prior to 2003 through the first six months of 2005 by $21.3. In addition, the Company determined that it did not properly account for deferred income tax assets and liabilities related to certain acquired entities, which required an adjustment in periods prior to 2003, and did not properly assess the realizability of certain tax attributes in determining its valuation allowance needs, which required adjustments primarily in periods prior to 2003 and in 2004. These adjustments increased earnings for periods prior to 2003 through the first six months of 2005 by $23.8. Other adjustments related to income taxes payable and income tax expense were also required. These adjustments related primarily to the determination of 2001 income tax related to the Company's discontinued Eyewear business and the determination of reserves for uncertain tax positions, which reduced net earnings for periods prior to 2003 through the first six months of 2005 by $9.4 and $5.3, respectively. Adjustments from periods prior to 2003 through the first six months of 2005 for other tax matters reduced earnings by $4.7.

The Company also noted additional issues, relating to deferred compensation, adequacy of reserves and currency adjustments.

112.   The Form 10-K for FY:05 also reiterated management's conclusion that as of December 31, 2005, there were material weaknesses in the Company's internal control over financial reporting. Specifically, management identified the following material weaknesses which permeated all functions and all levels of Bausch & Lomb:

(1) ***Control Environment  The Company did not maintain an effective control environment*** because of the following: (a) the Company did not adequately and consistently reinforce the importance of adherence to controls and the Company's code of conduct, which contributed to certain of the restatement items that occurred across a broad range of the Company's operational and functional areas; (b) the Company failed to institute all elements of an effective program to help prevent and detect fraud by Company employees; (c) the Company did not establish and maintain effective corporate and regional management oversight and monitoring of operations to detect subsidiaries' managements' override of established financial controls and accounting policies, execution of improper transactions and accounting entries to impact revenue and earnings, and reporting of these transactions to the appropriate finance personnel or the Company's independent registered public accounting firm; and (d) the Company did not maintain a sufficient complement of personnel with an appropriate level of knowledge, experience and training in the application of GAAP, including revenue recognition and accounting for income taxes, and in internal controls over financial reporting commensurate with its financial reporting requirements.  This material weakness contributed to the additional material weakness discussed in items 2-4 below.

(2) ***Controls Over the Financial Reporting and Close Process  The Company did not maintain effective controls to provide reasonable assurance of the completeness and accuracy of certain financial statement accounts in certain subsidiaries***.  Specifically, the Company did not maintain effective controls to ensure that account reconciliations and journal entries were supported by appropriate analysis and documentation in connection with the financial reporting and close process.  This material weakness resulted in the restatement of the Company's 2004 and 2003 annual consolidated financial statements and all quarterly periods of 2004, and the first two quarters of 2005, as well as adjustments, including audit adjustments to the 2005 third quarter interim and the 2005 annual consolidated financial statements.  In addition, the Company restated beginning shareholders' equity for the impact of the restatement for periods prior to 2003.

(3) ***Controls Over Revenue Recognition and Sales Practices  The Company did not maintain effective controls over certain subsidiaries' relationships with their key distributors,*** particularly in the Company's Korea, Japan and India subsidiaries, ***and did not maintain effective controls over the installation of refractive laser surgery equipment in multiple locations where the Company does business***, to ensure that revenue associated with such distributor and laser sales was recognized in accordance with GAAP.  Specifically, the Company did not maintain effective controls to provide reasonable assurance that customer arrangements were adequately reviewed by the appropriate persons at such subsidiaries to identify and provide reasonable assurance regarding the proper application of the appropriate method of revenue recognition in accordance with GAAP.  In addition, the Company did not maintain effective controls to prevent subsidiary management from overriding established financial controls or making errors in the application of policies concerning the accuracy and valuation of accounts receivable and the maintenance of distributor inventory at established threshold levels, as well as regarding administration of credit limits, extension of credit terms, price discounting,

sales returns and exchanges, transfer of the risk of ownership, and sales order entry and control. This material weakness resulted in the restatement of the Company's 2004 and 2003 annual consolidated financial statements. In addition, the Company restated beginning shareholders' equity for the impact of the restatement for periods prior to 2003.

(4) ***Controls over Tax Accounting The Company did not maintain effective controls over the determination and reporting of its income tax payable, deferred income tax assets and liabilities, the related valuation allowances and income tax expense***. Specifically, effective controls were not designed and in place to: (i) ensure management maintained the appropriate level of personnel resources with adequate experience and expertise in the area of U.S. GAAP accounting for income taxes; (ii) ensure roles and responsibilities with respect to accounting for income taxes were clearly defined; (iii) identify and evaluate in a timely manner the tax implications of certain non-routine transactions, including transactions related to acquisitions; (iv) provide reasonable assurance as to the completeness and accuracy of the provision for income taxes and income taxes payable including tax reserves and return to provision adjustments; and (v) reconcile differences between the tax and financial reporting basis of its assets and liabilities with its deferred income tax assets and liabilities. In addition, the Company did not maintain effective controls over indirect taxes, including VAT and certain import related taxes related to its Brazilian subsidiary. This material weakness resulted in the restatement of the Company's 2004 and 2003 annual consolidated financial statements and all quarterly periods of 2004, and the first two quarters of 2005, as well as adjustments, including audit adjustments to the 2005 third quarter interim and the 2005 annual consolidated financial statements. In addition, the Company restated beginning shareholders' equity for the impact of the restatement for periods prior to 2003.

(5) ***Controls Over Deferred Compensation Plan The Company did not maintain effective controls to ensure that the Company's Deferred Compensation Plan document was amended to accurately reflect the Plan's intended design***. This inaccurate amendment of the plan resulted in the Company not properly marking to market stock awards issued under the Company's Long-Term Incentive Plan that were deferred under the Deferred Compensation Plan which impacted the completeness and accuracy of selling, administrative and general expense and accrued liabilities. This material weakness resulted in the restatement of the Company's 2004 and 2003 annual consolidated financial statements and all quarterly periods of 2004, and the first two quarters of 2005, as well as adjustments, including audit adjustments to the 2005 third quarter interim and the 2005 annual consolidated financial statements. In addition, the Company restated beginning shareholders' equity for the impact of the restatement for periods prior to 2003.

113.    The problems plaguing the Company were not limited to its Brazilian and Asian subsidiaries. In fact, the 2006 Form 10-K revealed that the Audit Committee had also commenced an investigation of the potential Foreign Corrupt Practices Act implications of the Company's

Spanish subsidiary's providing free product, principally intraocular lenses used in cataract surgery, and other things of value to doctors performing surgical procedures in public health facilities in Spain.  This investigation was initiated following reports of potentially improper sales practices by a former employee and was voluntarily reported to the Northeast Regional Office of the SEC. According to the Form 10-K, the extent of the potential liability of the Company or its Spanish subsidiary in connection with these matters, which may also raise issues under local laws, is not yet known.

## ILLEGAL INSIDER SELLING

114.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Bausch & Lomb stock, which sales were unusual in amount and suspicious in timing:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| William H. Waltrip | 11/1/2005 | 4,000 | $ 74.04 | $ 296,160.00 |
| | 11/1/2005 | 200 | $ 74.06 | $ 14,812.00 |
| | 11/1/2005 | 1,600 | $ 74.09 | $ 118,544.00 |
| | 11/1/2005 | 300 | $ 73.93 | $ 22,179.00 |
| | 11/1/2005 | 300 | $ 73.95 | $ 22,185.00 |
| | 11/1/2005 | 100 | $ 73.98 | $ 7,398.00 |
| | 11/1/2005 | 300 | $ 73.90 | $ 22,170.00 |
| | 11/1/2005 | 100 | $ 73.91 | $ 7,391.00 |
| | 11/1/2005 | 2,400 | $ 73.92 | $ 177,408.00 |
| | 11/1/2005 | 1,200 | $ 73.86 | $ 88,632.00 |
| | 11/1/2005 | 800 | $ 73.87 | $ 59,096.00 |
| | 11/1/2005 | 600 | $ 73.88 | $ 44,328.00 |
| | 11/1/2005 | 200 | $ 73.75 | $ 14,750.00 |
| | 11/1/2005 | 200 | $ 73.81 | $ 14,762.00 |
| | 11/1/2005 | 500 | $ 73.85 | $ 36,925.00 |
| | 11/1/2005 | 500 | $ 73.68 | $ 36,840.00 |
| | 11/1/2005 | 200 | $ 73.70 | $ 14,740.00 |
| | 11/1/2005 | 200 | $ 73.74 | $ 14,748.00 |
| | 11/1/2005 | 100 | $ 73.51 | $ 7,351.00 |
| | 11/1/2005 | 400 | $ 73.53 | $ 29,412.00 |
| | 11/1/2005 | 400 | $ 73.62 | $ 29,448.00 |
| | 11/1/2005 | 300 | $ 73.45 | $ 22,035.00 |
| | 11/1/2005 | 600 | $ 73.47 | $ 44,082.00 |
| | 11/1/2005 | 100 | $ 73.49 | $ 7,349.00 |
| | 11/1/2005 | 6,700 | $ 73.37 | $ 491,579.00 |

| 11/1/2005 | 300 | $ | 73.38 | $ | 22,014.00 |
|---|---|---|---|---|---|
| 11/1/2005 | 2,400 | $ | 73.40 | $ | 176,160.00 |
| 8/1/2005 | 800 | $ | 83.79 | $ | 67,032.00 |
| 8/1/2005 | 100 | $ | 83.80 | $ | 8,380.00 |
| 8/1/2005 | 100 | $ | 83.51 | $ | 8,351.00 |
| 8/1/2005 | 500 | $ | 83.72 | $ | 41,860.00 |
| 8/1/2005 | 600 | $ | 83.74 | $ | 50,244.00 |
| 8/1/2005 | 100 | $ | 83.75 | $ | 8,375.00 |
| 8/1/2005 | 900 | $ | 83.66 | $ | 75,294.00 |
| 8/1/2005 | 900 | $ | 83.67 | $ | 75,303.00 |
| 8/1/2005 | 200 | $ | 83.68 | $ | 16,736.00 |
| 8/1/2005 | 1,200 | $ | 83.63 | $ | 100,356.00 |
| 8/1/2005 | 100 | $ | 83.64 | $ | 8,364.00 |
| 8/1/2005 | 1,300 | $ | 83.65 | $ | 108,745.00 |
| 8/1/2005 | 100 | $ | 83.60 | $ | 8,360.00 |
| 8/1/2005 | 200 | $ | 83.61 | $ | 16,722.00 |
| 8/1/2005 | 200 | $ | 83.62 | $ | 16,724.00 |
| 8/1/2005 | 400 | $ | 83.56 | $ | 33,424.00 |
| 8/1/2005 | 700 | $ | 83.57 | $ | 58,499.00 |
| 8/1/2005 | 400 | $ | 83.58 | $ | 33,432.00 |
| 8/1/2005 | 300 | $ | 83.53 | $ | 25,059.00 |
| 8/1/2005 | 100 | $ | 83.54 | $ | 8,354.00 |
| 8/1/2005 | 200 | $ | 83.55 | $ | 16,710.00 |
| 8/1/2005 | 200 | $ | 84.79 | $ | 16,958.00 |
| 8/1/2005 | 100 | $ | 84.81 | $ | 8,481.00 |
| 8/1/2005 | 600 | $ | 84.78 | $ | 50,868.00 |
| 8/1/2005 | 1,200 | $ | 84.65 | $ | 101,580.00 |
| 8/1/2005 | 2,900 | $ | 84.73 | $ | 245,717.00 |
| 8/1/2005 | 4,200 | $ | 84.75 | $ | 355,950.00 |
| 8/1/2005 | 100 | $ | 84.47 | $ | 8,447.00 |
| 8/1/2005 | 100 | $ | 84.50 | $ | 8,450.00 |
| 8/1/2005 | 300 | $ | 84.56 | $ | 25,368.00 |
| 8/1/2005 | 500 | $ | 84.13 | $ | 42,065.00 |
| 8/1/2005 | 600 | $ | 84.20 | $ | 50,520.00 |
| 8/1/2005 | 500 | $ | 84.30 | $ | 42,150.00 |
| 8/1/2005 | 100 | $ | 84.06 | $ | 8,406.00 |
| 8/1/2005 | 200 | $ | 84.09 | $ | 16,818.00 |
| 8/1/2005 | 400 | $ | 84.10 | $ | 33,640.00 |
| 8/1/2005 | 100 | $ | 83.99 | $ | 8,399.00 |
| 8/1/2005 | 200 | $ | 84.00 | $ | 16,800.00 |
| 8/1/2005 | 200 | $ | 84.01 | $ | 16,802.00 |
| 8/1/2005 | 300 | $ | 83.83 | $ | 25,149.00 |
| 8/1/2005 | 200 | $ | 83.84 | $ | 16,768.00 |
| 8/1/2005 | 2,300 | $ | 83.85 | $ | 192,855.00 |
| 8/1/2005 | 300 | $ | 83.81 | $ | 25,143.00 |
| 5/13/2005 | 400 | $ | 76.32 | $ | 30,528.00 |
| 5/13/2005 | 400 | $ | 76.36 | $ | 30,544.00 |
| 5/13/2005 | 1,400 | $ | 76.35 | $ | 106,890.00 |
| 5/13/2005 | 1,800 | $ | 76.33 | $ | 137,394.00 |
| 5/13/2005 | 100 | $ | 76.41 | $ | 7,641.00 |
| 5/13/2005 | 300 | $ | 76.40 | $ | 22,920.00 |

| | | | | | |
|---|---|---|---|---|---|
| 5/13/2005 | 200 | $ | 76.39 | $ | 15,278.00 |
| 5/13/2005 | 100 | $ | 76.86 | $ | 7,686.00 |
| 5/13/2005 | 200 | $ | 76.85 | $ | 15,370.00 |
| 5/13/2005 | 500 | $ | 76.51 | $ | 38,255.00 |
| 5/13/2005 | 600 | $ | 76.50 | $ | 45,900.00 |
| 5/13/2005 | 100 | $ | 76.49 | $ | 7,649.00 |
| 5/13/2005 | 500 | $ | 76.57 | $ | 38,285.00 |
| 5/13/2005 | 200 | $ | 76.56 | $ | 15,312.00 |
| 5/13/2005 | 200 | $ | 76.52 | $ | 15,304.00 |
| 5/13/2005 | 700 | $ | 76.61 | $ | 53,627.00 |
| 5/13/2005 | 100 | $ | 76.60 | $ | 7,660.00 |
| 5/13/2005 | 200 | $ | 76.58 | $ | 15,316.00 |
| 5/13/2005 | 500 | $ | 76.65 | $ | 38,325.00 |
| 5/13/2005 | 1,000 | $ | 76.64 | $ | 76,640.00 |
| 5/13/2005 | 200 | $ | 76.62 | $ | 15,324.00 |
| 5/13/2005 | 500 | $ | 76.69 | $ | 38,345.00 |
| 5/13/2005 | 100 | $ | 76.68 | $ | 7,668.00 |
| 5/13/2005 | 100 | $ | 76.67 | $ | 7,667.00 |
| 5/13/2005 | 200 | $ | 76.81 | $ | 15,362.00 |
| 5/13/2005 | 561 | $ | 76.80 | $ | 43,084.80 |
| 5/13/2005 | 100 | $ | 76.73 | $ | 7,673.00 |
| 5/13/2005 | 100 | $ | 76.46 | $ | 7,646.00 |
| 5/13/2005 | 100 | $ | 76.43 | $ | 7,643.00 |
| 5/13/2005 | 400 | $ | 75.56 | $ | 30,224.00 |
| 5/13/2005 | 100 | $ | 75.60 | $ | 7,560.00 |
| 5/13/2005 | 100 | $ | 75.59 | $ | 7,559.00 |
| 5/13/2005 | 100 | $ | 75.58 | $ | 7,558.00 |
| 5/13/2005 | 100 | $ | 76.65 | $ | 7,665.00 |
| 5/13/2005 | 100 | $ | 75.64 | $ | 7,564.00 |
| 5/13/2005 | 100 | $ | 75.61 | $ | 7,561.00 |
| 5/13/2005 | 3,200 | $ | 75.72 | $ | 242,304.00 |
| 5/13/2005 | 100 | $ | 75.71 | $ | 7,571.00 |
| 5/13/2005 | 300 | $ | 75.70 | $ | 22,710.00 |
| 5/13/2005 | 500 | $ | 75.79 | $ | 37,895.00 |
| 5/13/2005 | 500 | $ | 75.74 | $ | 37,870.00 |
| 5/13/2005 | 300 | $ | 75.73 | $ | 22,719.00 |
| 5/13/2005 | 600 | $ | 75.83 | $ | 45,498.00 |
| 5/13/2005 | 400 | $ | 75.82 | $ | 30,328.00 |
| 5/13/2005 | 5,200 | $ | 75.80 | $ | 394,160.00 |
| 5/13/2005 | 1,200 | $ | 76.01 | $ | 91,212.00 |
| 5/13/2005 | 500 | $ | 75.85 | $ | 37,925.00 |
| 5/13/2005 | 300 | $ | 75.84 | $ | 22,752.00 |
| 5/13/2005 | 600 | $ | 76.05 | $ | 45,630.00 |
| 5/13/2005 | 100 | $ | 76.04 | $ | 7,604.00 |
| 5/13/2005 | 700 | $ | 76.03 | $ | 53,221.00 |
| 5/13/2005 | 200 | $ | 76.13 | $ | 15,226.00 |
| 5/13/2005 | 400 | $ | 76.12 | $ | 30,448.00 |
| 5/13/2005 | 3,400 | $ | 76.10 | $ | 258,740.00 |
| 5/13/2005 | 300 | $ | 76.20 | $ | 22,860.00 |
| 5/13/2005 | 300 | $ | 76.17 | $ | 22,851.00 |
| 5/13/2005 | 100 | $ | 76.15 | $ | 7,615.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/13/2005 | 100 | $ | 76.25 | $ | 7,625.00 |
| 5/13/2005 | 500 | $ | 76.21 | $ | 38,105.00 |
| 5/13/2005 | 200 | $ | 75.15 | $ | 15,030.00 |
| 5/13/2005 | 600 | $ | 75.11 | $ | 45,066.00 |
| 5/13/2005 | 100 | $ | 75.10 | $ | 7,510.00 |
| 5/13/2005 | 100 | $ | 75.19 | $ | 7,519.00 |
| 5/13/2005 | 100 | $ | 75.18 | $ | 7,518.00 |
| 5/13/2005 | 300 | $ | 75.17 | $ | 22,551.00 |
| 5/13/2005 | 800 | $ | 75.22 | $ | 60,176.00 |
| 5/13/2005 | 2,600 | $ | 75.21 | $ | 195,546.00 |
| 5/13/2005 | 700 | $ | 75.20 | $ | 52,640.00 |
| 5/13/2005 | 400 | $ | 75.25 | $ | 30,100.00 |
| 5/13/2005 | 200 | $ | 75.24 | $ | 15,048.00 |
| 5/13/2005 | 500 | $ | 75.23 | $ | 37,615.00 |
| 5/13/2005 | 500 | $ | 75.29 | $ | 37,645.00 |
| 5/13/2005 | 100 | $ | 75.27 | $ | 7,527.00 |
| 5/13/2005 | 600 | $ | 75.26 | $ | 45,156.00 |
| 5/13/2005 | 500 | $ | 75.32 | $ | 37,660.00 |
| 5/13/2005 | 100 | $ | 75.31 | $ | 7,531.00 |
| 5/13/2005 | 900 | $ | 75.30 | $ | 67,770.00 |
| 5/13/2005 | 400 | $ | 75.36 | $ | 30,144.00 |
| 5/13/2005 | 200 | $ | 75.35 | $ | 15,070.00 |
| 5/13/2005 | 1,500 | $ | 75.33 | $ | 112,995.00 |
| 5/13/2005 | 900 | $ | 75.49 | $ | 67,941.00 |
| 5/13/2005 | 1,000 | $ | 75.48 | $ | 75,480.00 |
| 5/13/2005 | 600 | $ | 75.37 | $ | 45,222.00 |
| 5/13/2005 | 1,300 | $ | 75.50 | $ | 98,150.00 |
| 3/8/2005 | 1,900 | $ | 73.86 | $ | 140,334.00 |
| 3/8/2005 | 331 | $ | 73.88 | $ | 24,454.28 |
| 4/26/2004 | 1,300 | $ | 65.00 | $ | 84,500.00 |
| 4/26/2004 | 1,099 | $ | 65.02 | $ | 71,456.98 |
| 2/19/2004 | 500 | $ | 59.09 | $ | 29,545.00 |
| 2/19/2004 | 17,300 | $ | 59.10 | $ | 1,022,430.00 |
| 2/19/2004 | 1,100 | $ | 59.16 | $ | 65,076.00 |
| 2/19/2004 | 1,600 | $ | 59.17 | $ | 94,672.00 |
| 2/19/2004 | 2,300 | $ | 59.18 | $ | 136,114.00 |
| 2/19/2004 | 600 | $ | 59.19 | $ | 35,514.00 |
| 2/19/2004 | 13,700 | $ | 59.20 | $ | 811,040.00 |
| 2/19/2004 | 100 | $ | 59.21 | $ | 5,921.00 |
| 2/19/2004 | 1,500 | $ | 59.22 | $ | 88,830.00 |
| 2/19/2004 | 400 | $ | 59.23 | $ | 23,692.00 |
| 2/19/2004 | 1,400 | $ | 59.24 | $ | 82,936.00 |
| 2/19/2004 | 400 | $ | 59.25 | $ | 23,700.00 |
| 2/19/2004 | 1,500 | $ | 59.26 | $ | 88,890.00 |
| 2/19/2004 | 3,000 | $ | 59.27 | $ | 177,810.00 |
| 2/19/2004 | 500 | $ | 59.30 | $ | 29,650.00 |
| 2/19/2004 | 500 | $ | 59.31 | $ | 29,655.00 |
| 2/19/2004 | 2,000 | $ | 59.32 | $ | 118,640.00 |
| 2/19/2004 | 1,600 | $ | 59.34 | $ | 94,944.00 |
| 11/5/2003 | 1,288 | $ | 48.13 | $ | 61,991.44 |
| 11/5/2003 | 2,900 | $ | 48.00 | $ | 139,200.00 |

| | | 156,279 | | | | $ 11,027,258.50 |
|---|---|---|---|---|---|---|
| Ronald L. Zarrella | 8/17/2005 | 200 | $ | 80.75 | $ | 16,150.00 |
| | 8/17/2005 | 600 | $ | 80.70 | $ | 48,420.00 |
| | 8/17/2005 | 300 | $ | 80.71 | $ | 24,213.00 |
| | 8/17/2005 | 800 | $ | 80.72 | $ | 64,576.00 |
| | 8/17/2005 | 200 | $ | 80.67 | $ | 16,134.00 |
| | 8/17/2005 | 700 | $ | 80.68 | $ | 56,476.00 |
| | 8/17/2005 | 200 | $ | 80.69 | $ | 16,138.00 |
| | 8/17/2005 | 1,000 | $ | 80.64 | $ | 80,640.00 |
| | 8/17/2005 | 1,900 | $ | 80.65 | $ | 153,235.00 |
| | 8/17/2005 | 800 | $ | 80.66 | $ | 64,528.00 |
| | 8/17/2005 | 400 | $ | 80.59 | $ | 32,236.00 |
| | 8/17/2005 | 1,100 | $ | 80.60 | $ | 88,660.00 |
| | 8/17/2005 | 600 | $ | 80.62 | $ | 48,372.00 |
| | 8/17/2005 | 200 | $ | 80.56 | $ | 16,112.00 |
| | 8/17/2005 | 400 | $ | 80.57 | $ | 32,228.00 |
| | 8/17/2005 | 1,800 | $ | 80.58 | $ | 145,044.00 |
| | 8/17/2005 | 100 | $ | 80.51 | $ | 8,051.00 |
| | 8/17/2005 | 100 | $ | 80.52 | $ | 8,052.00 |
| | 8/17/2005 | 100 | $ | 80.55 | $ | 8,055.00 |
| | 8/17/2005 | 400 | $ | 80.50 | $ | 32,200.00 |
| | 8/17/2005 | 100 | $ | 80.43 | $ | 8,043.00 |
| | 8/17/2005 | 100 | $ | 80.45 | $ | 8,045.00 |
| | 8/17/2005 | 100 | $ | 80.31 | $ | 8,031.00 |
| | 8/17/2005 | 300 | $ | 80.35 | $ | 24,105.00 |
| | 8/17/2005 | 500 | $ | 80.37 | $ | 40,185.00 |
| | 8/17/2005 | 200 | $ | 80.02 | $ | 16,004.00 |
| | 8/17/2005 | 100 | $ | 80.21 | $ | 8,021.00 |
| | 8/17/2005 | 100 | $ | 80.28 | $ | 8,028.00 |
| | 8/17/2005 | 100 | $ | 79.99 | $ | 7,999.00 |
| | 8/17/2005 | 1,300 | $ | 80.00 | $ | 104,000.00 |
| | 8/17/2005 | 200 | $ | 80.01 | $ | 16,002.00 |
| | 8/17/2005 | 100 | $ | 79.96 | $ | 7,996.00 |
| | 8/17/2005 | 200 | $ | 79.97 | $ | 15,994.00 |
| | 8/17/2005 | 300 | $ | 79.98 | $ | 23,994.00 |
| | 8/17/2005 | 200 | $ | 79.93 | $ | 15,986.00 |
| | 8/17/2005 | 300 | $ | 79.94 | $ | 23,982.00 |
| | 8/17/2005 | 400 | $ | 79.95 | $ | 31,980.00 |
| | 8/17/2005 | 200 | $ | 79.90 | $ | 15,980.00 |
| | 8/17/2005 | 1,000 | $ | 79.91 | $ | 79,910.00 |
| | 8/17/2005 | 200 | $ | 79.92 | $ | 15,984.00 |
| | 8/17/2005 | 200 | $ | 79.84 | $ | 15,968.00 |
| | 8/17/2005 | 200 | $ | 79.87 | $ | 15,974.00 |
| | 8/17/2005 | 100 | $ | 79.89 | $ | 7,989.00 |
| | 8/17/2005 | 200 | $ | 80.38 | $ | 16,076.00 |
| | 8/17/2005 | 1,400 | $ | 80.40 | $ | 112,560.00 |
| | 8/17/2005 | 100 | $ | 79.85 | $ | 7,985.00 |
| | 8/17/2005 | 300 | $ | 79.86 | $ | 23,958.00 |
| | 8/17/2005 | 300 | $ | 80.13 | $ | 24,039.00 |
| | 8/17/2005 | 100 | $ | 80.14 | $ | 8,014.00 |

| 8/17/2005 | 200 | $ | 80.16 | $ | 16,032.00 |
|---|---|---|---|---|---|
| 8/17/2005 | 200 | $ | 80.06 | $ | 16,012.00 |
| 8/17/2005 | 400 | $ | 80.07 | $ | 32,028.00 |
| 8/17/2005 | 1,200 | $ | 80.11 | $ | 96,132.00 |
| 8/17/2005 | 200 | $ | 80.03 | $ | 16,006.00 |
| 8/17/2005 | 200 | $ | 80.41 | $ | 16,082.00 |
| 8/17/2005 | 300 | $ | 80.29 | $ | 24,087.00 |
| 8/17/2005 | 100 | $ | 80.33 | $ | 8,033.00 |
| 8/17/2005 | 100 | $ | 80.34 | $ | 8,034.00 |
| 8/17/2005 | 500 | $ | 80.18 | $ | 40,090.00 |
| 8/17/2005 | 100 | $ | 80.19 | $ | 8,019.00 |
| 8/17/2005 | 500 | $ | 80.25 | $ | 40,125.00 |
| 8/17/2005 | 200 | $ | 80.17 | $ | 16,034.00 |
| 5/17/2005 | 600 | $ | 76.33 | $ | 45,798.00 |
| 5/17/2005 | 100 | $ | 76.31 | $ | 7,631.00 |
| 5/17/2005 | 2,500 | $ | 76.30 | $ | 190,750.00 |
| 5/17/2005 | 100 | $ | 76.38 | $ | 7,638.00 |
| 5/17/2005 | 4,500 | $ | 76.35 | $ | 343,575.00 |
| 5/17/2005 | 1,300 | $ | 76.34 | $ | 99,242.00 |
| 5/17/2005 | 700 | $ | 76.40 | $ | 53,480.00 |
| 5/17/2005 | 1,000 | $ | 76.41 | $ | 76,410.00 |
| 5/17/2005 | 5,100 | $ | 76.52 | $ | 390,252.00 |
| 5/17/2005 | 4,600 | $ | 76.51 | $ | 351,946.00 |
| 5/17/2005 | 500 | $ | 76.42 | $ | 38,210.00 |
| 5/17/2005 | 700 | $ | 76.43 | $ | 53,501.00 |
| 5/17/2005 | 300 | $ | 76.50 | $ | 22,950.00 |
| 5/17/2005 | 700 | $ | 76.53 | $ | 53,571.00 |
| 5/17/2005 | 1,200 | $ | 76.49 | $ | 91,788.00 |
| 5/17/2005 | 100 | $ | 76.56 | $ | 7,656.00 |
| 5/17/2005 | 1,000 | $ | 76.55 | $ | 76,550.00 |
| 2/17/2005 | 400 | $ | 71.87 | $ | 28,748.00 |
| 2/17/2005 | 100 | $ | 71.50 | $ | 7,150.00 |
| 2/17/2005 | 100 | $ | 71.48 | $ | 7,148.00 |
| 2/17/2005 | 300 | $ | 71.58 | $ | 21,474.00 |
| 2/17/2005 | 200 | $ | 71.53 | $ | 14,306.00 |
| 2/17/2005 | 300 | $ | 71.52 | $ | 21,456.00 |
| 2/17/2005 | 400 | $ | 71.67 | $ | 28,668.00 |
| 2/17/2005 | 300 | $ | 71.61 | $ | 21,483.00 |
| 2/17/2005 | 300 | $ | 71.59 | $ | 21,477.00 |
| 2/17/2005 | 300 | $ | 71.76 | $ | 21,528.00 |
| 2/17/2005 | 400 | $ | 71.75 | $ | 28,700.00 |
| 2/17/2005 | 100 | $ | 71.70 | $ | 7,170.00 |
| 2/17/2005 | 400 | $ | 71.79 | $ | 28,716.00 |
| 2/17/2005 | 200 | $ | 71.78 | $ | 14,356.00 |
| 2/17/2005 | 200 | $ | 71.77 | $ | 14,354.00 |
| 2/17/2005 | 200 | $ | 71.82 | $ | 14,364.00 |
| 2/17/2005 | 700 | $ | 71.81 | $ | 50,267.00 |
| 2/17/2005 | 100 | $ | 71.80 | $ | 7,180.00 |
| 2/17/2005 | 100 | $ | 71.88 | $ | 7,188.00 |
| 2/17/2005 | 1,100 | $ | 71.84 | $ | 79,024.00 |
| 2/17/2005 | 200 | $ | 71.83 | $ | 14,366.00 |

| | | | | |
|---|---|---|---|---|
| 2/17/2005 | 800 | $ | 71.91 | $ | 57,528.00 |
| 2/17/2005 | 100 | $ | 71.90 | $ | 7,190.00 |
| 2/17/2005 | 2,200 | $ | 71.89 | $ | 158,158.00 |
| 2/17/2005 | 1,000 | $ | 72.03 | $ | 72,030.00 |
| 2/17/2005 | 100 | $ | 72.00 | $ | 7,200.00 |
| 2/17/2005 | 400 | $ | 71.99 | $ | 28,796.00 |
| 2/17/2005 | 300 | $ | 71.86 | $ | 21,558.00 |
| 2/17/2005 | 1,300 | $ | 71.85 | $ | 93,405.00 |
| 2/17/2005 | 200 | $ | 71.12 | $ | 14,224.00 |
| 2/17/2005 | 200 | $ | 71.11 | $ | 14,222.00 |
| 2/17/2005 | 1,300 | $ | 71.10 | $ | 92,430.00 |
| 2/17/2005 | 500 | $ | 71.15 | $ | 35,575.00 |
| 2/17/2005 | 300 | $ | 71.14 | $ | 21,342.00 |
| 2/17/2005 | 1,700 | $ | 71.13 | $ | 120,921.00 |
| 2/17/2005 | 800 | $ | 71.18 | $ | 56,944.00 |
| 2/17/2005 | 700 | $ | 71.17 | $ | 49,819.00 |
| 2/17/2005 | 300 | $ | 71.16 | $ | 21,348.00 |
| 2/17/2005 | 100 | $ | 71.23 | $ | 7,123.00 |
| 2/17/2005 | 1,100 | $ | 71.20 | $ | 78,320.00 |
| 2/17/2005 | 300 | $ | 71.19 | $ | 21,357.00 |
| 2/17/2005 | 1,900 | $ | 71.45 | $ | 135,755.00 |
| 2/17/2005 | 600 | $ | 71.37 | $ | 42,822.00 |
| 2/17/2005 | 2,100 | $ | 71.26 | $ | 149,646.00 |
| 2/17/2005 | 300 | $ | 71.09 | $ | 21,327.00 |
| 11/15/2004 | 2,000 | $ | 60.69 | $ | 121,380.00 |
| 11/15/2004 | 1,700 | $ | 60.68 | $ | 103,156.00 |
| 11/15/2004 | 500 | $ | 60.79 | $ | 30,395.00 |
| 11/15/2004 | 1,700 | $ | 60.76 | $ | 103,292.00 |
| 11/15/2004 | 6,500 | $ | 60.75 | $ | 394,875.00 |
| 11/15/2004 | 800 | $ | 60.84 | $ | 48,672.00 |
| 11/15/2004 | 400 | $ | 60.83 | $ | 24,332.00 |
| 11/15/2004 | 10,600 | $ | 60.80 | $ | 644,480.00 |
| 11/15/2004 | 4,300 | $ | 60.88 | $ | 261,784.00 |
| 11/15/2004 | 1,600 | $ | 60.87 | $ | 97,392.00 |
| 11/15/2004 | 2,000 | $ | 60.85 | $ | 121,700.00 |
| 11/15/2004 | 500 | $ | 60.91 | $ | 30,455.00 |
| 11/15/2004 | 1,000 | $ | 60.90 | $ | 60,900.00 |
| 11/15/2004 | 100 | $ | 60.89 | $ | 6,089.00 |
| 11/15/2004 | 1,100 | $ | 61.04 | $ | 67,144.00 |
| 11/15/2004 | 200 | $ | 60.93 | $ | 12,186.00 |
| 11/15/2004 | 3,700 | $ | 60.92 | $ | 225,404.00 |
| 11/15/2004 | 100 | $ | 61.20 | $ | 6,120.00 |
| 11/15/2004 | 200 | $ | 61.10 | $ | 12,220.00 |
| 11/15/2004 | 700 | $ | 61.05 | $ | 42,735.00 |
| 11/15/2004 | 100 | $ | 61.50 | $ | 6,150.00 |
| 11/15/2004 | 200 | $ | 61.35 | $ | 12,270.00 |
| 11/15/2004 | 400 | $ | 61.21 | $ | 24,484.00 |
| 11/15/2004 | 3,900 | $ | 61.80 | $ | 241,020.00 |
| 11/15/2004 | 600 | $ | 61.58 | $ | 36,948.00 |
| 11/15/2004 | 100 | $ | 61.51 | $ | 6,151.00 |
| 8/19/2004 | 400 | $ | 63.70 | $ | 25,480.00 |

| | | | | |
|---|---|---|---|---|
| 8/19/2004 | 600 | $ | 63.71 | $ | 38,226.00 |
| 8/19/2004 | 19,000 | $ | 63.47 | $ | 1,205,930.00 |
| 8/19/2004 | 25,000 | $ | 63.65 | $ | 1,591,250.00 |
| 5/17/2004 | 2,600 | $ | 60.60 | $ | 157,560.00 |
| 5/17/2004 | 1,900 | $ | 60.59 | $ | 115,121.00 |
| 5/17/2004 | 200 | $ | 60.64 | $ | 12,128.00 |
| 5/17/2004 | 500 | $ | 60.63 | $ | 30,315.00 |
| 5/17/2004 | 100 | $ | 60.61 | $ | 6,061.00 |
| 5/17/2004 | 2,000 | $ | 60.68 | $ | 121,360.00 |
| 5/17/2004 | 100 | $ | 60.66 | $ | 6,066.00 |
| 5/17/2004 | 2,900 | $ | 60.65 | $ | 175,885.00 |
| 5/17/2004 | 500 | $ | 60.74 | $ | 30,370.00 |
| 5/17/2004 | 3,400 | $ | 60.70 | $ | 206,380.00 |
| 5/17/2004 | 300 | $ | 60.69 | $ | 18,207.00 |
| 5/17/2004 | 300 | $ | 60.91 | $ | 18,273.00 |
| 5/17/2004 | 1,000 | $ | 60.90 | $ | 60,900.00 |
| 5/17/2004 | 1,200 | $ | 60.85 | $ | 73,020.00 |
| 5/17/2004 | 100 | $ | 61.17 | $ | 6,117.00 |
| 5/17/2004 | 100 | $ | 61.16 | $ | 6,116.00 |
| 5/17/2004 | 200 | $ | 61.14 | $ | 12,228.00 |
| 5/17/2004 | 700 | $ | 61.28 | $ | 42,896.00 |
| 5/17/2004 | 200 | $ | 61.25 | $ | 12,250.00 |
| 5/17/2004 | 400 | $ | 61.20 | $ | 24,480.00 |
| 5/17/2004 | 200 | $ | 61.43 | $ | 12,286.00 |
| 5/17/2004 | 100 | $ | 61.40 | $ | 6,140.00 |
| 5/17/2004 | 300 | $ | 61.30 | $ | 18,390.00 |
| 5/17/2004 | 1,400 | $ | 61.51 | $ | 86,114.00 |
| 5/17/2004 | 600 | $ | 61.45 | $ | 36,870.00 |
| 5/17/2004 | 1,000 | $ | 61.44 | $ | 61,440.00 |
| 5/17/2004 | 2,000 | $ | 61.70 | $ | 123,400.00 |
| 5/17/2004 | 300 | $ | 61.60 | $ | 18,480.00 |
| 5/17/2004 | 300 | $ | 61.54 | $ | 18,462.00 |
| 5/17/2004 | 3,000 | $ | 60.38 | $ | 181,140.00 |
| 5/17/2004 | 600 | $ | 60.37 | $ | 36,222.00 |
| 5/17/2004 | 2,500 | $ | 60.36 | $ | 150,900.00 |
| 5/17/2004 | 1,800 | $ | 60.42 | $ | 108,756.00 |
| 5/17/2004 | 100 | $ | 60.41 | $ | 6,041.00 |
| 5/17/2004 | 400 | $ | 60.40 | $ | 24,160.00 |
| 5/17/2004 | 2,000 | $ | 60.50 | $ | 121,000.00 |
| 5/17/2004 | 1,500 | $ | 60.45 | $ | 90,675.00 |
| 5/17/2004 | 200 | $ | 60.43 | $ | 12,086.00 |
| 5/17/2004 | 1,800 | $ | 60.56 | $ | 109,008.00 |
| 5/17/2004 | 1,000 | $ | 60.55 | $ | 60,550.00 |
| 5/17/2004 | 200 | $ | 60.52 | $ | 12,104.00 |
| 5/17/2004 | 4,200 | $ | 60.58 | $ | 254,436.00 |
| 5/17/2004 | 800 | $ | 60.57 | $ | 48,456.00 |
| 2/19/2004 | 1,600 | $ | 58.49 | $ | 93,584.00 |
| 2/19/2004 | 4,000 | $ | 58.50 | $ | 234,000.00 |
| 2/19/2004 | 2,300 | $ | 58.52 | $ | 134,596.00 |
| 2/19/2004 | 1,600 | $ | 58.53 | $ | 93,648.00 |
| 2/19/2004 | 800 | $ | 58.46 | $ | 46,768.00 |

| | | | | |
|---|---|---|---|---|
| 2/19/2004 | 1,700 | $ | 58.56 | $ 99,552.00 |
| 2/19/2004 | 1,900 | $ | 58.57 | $ 111,283.00 |
| 2/19/2004 | 100 | $ | 58.51 | $ 5,851.00 |
| 2/19/2004 | 800 | $ | 58.59 | $ 46,872.00 |
| 2/19/2004 | 800 | $ | 58.60 | $ 46,880.00 |
| 2/19/2004 | 200 | $ | 58.54 | $ 11,708.00 |
| 2/19/2004 | 1,300 | $ | 58.64 | $ 76,232.00 |
| 2/19/2004 | 700 | $ | 58.66 | $ 41,062.00 |
| 2/19/2004 | 300 | $ | 58.58 | $ 17,574.00 |
| 2/19/2004 | 1,700 | $ | 58.70 | $ 99,790.00 |
| 2/19/2004 | 300 | $ | 58.71 | $ 17,613.00 |
| 2/19/2004 | 800 | $ | 58.61 | $ 46,888.00 |
| 2/19/2004 | 700 | $ | 58.73 | $ 41,111.00 |
| 2/19/2004 | 1,100 | $ | 58.74 | $ 64,614.00 |
| 2/19/2004 | 1,200 | $ | 58.68 | $ 70,416.00 |
| 2/19/2004 | 300 | $ | 58.76 | $ 17,628.00 |
| 2/19/2004 | 600 | $ | 58.77 | $ 35,262.00 |
| 2/19/2004 | 700 | $ | 58.72 | $ 41,104.00 |
| 2/19/2004 | 600 | $ | 58.80 | $ 35,280.00 |
| 2/19/2004 | 200 | $ | 58.81 | $ 11,762.00 |
| 2/19/2004 | 700 | $ | 58.75 | $ 41,125.00 |
| 2/19/2004 | 200 | $ | 58.83 | $ 11,766.00 |
| 2/19/2004 | 600 | $ | 58.85 | $ 35,310.00 |
| 2/19/2004 | 300 | $ | 58.78 | $ 17,634.00 |
| 2/19/2004 | 800 | $ | 58.90 | $ 47,120.00 |
| 2/19/2004 | 1,000 | $ | 58.92 | $ 58,920.00 |
| 2/19/2004 | 1,100 | $ | 59.00 | $ 64,900.00 |
| 2/19/2004 | 900 | $ | 59.01 | $ 53,109.00 |
| 2/19/2004 | 200 | $ | 58.88 | $ 11,776.00 |
| 2/19/2004 | 700 | $ | 59.03 | $ 41,321.00 |
| 2/19/2004 | 1,800 | $ | 59.05 | $ 106,290.00 |
| 2/19/2004 | 900 | $ | 58.97 | $ 53,073.00 |
| 2/19/2004 | 900 | $ | 59.08 | $ 53,172.00 |
| 2/19/2004 | 200 | $ | 59.10 | $ 11,820.00 |
| 2/19/2004 | 900 | $ | 59.02 | $ 53,118.00 |
| 2/19/2004 | 700 | $ | 59.12 | $ 41,384.00 |
| 2/19/2004 | 300 | $ | 59.14 | $ 17,742.00 |
| 2/19/2004 | 800 | $ | 59.07 | $ 47,256.00 |
| 2/19/2004 | 300 | $ | 59.16 | $ 17,748.00 |
| 2/19/2004 | 1,100 | $ | 59.20 | $ 65,120.00 |
| 2/19/2004 | 200 | $ | 59.11 | $ 11,822.00 |
| 2/19/2004 | 400 | $ | 59.23 | $ 23,692.00 |
| 2/19/2004 | 400 | $ | 59.27 | $ 23,708.00 |
| 2/19/2004 | 800 | $ | 59.15 | $ 47,320.00 |
| 2/19/2004 | 700 | $ | 59.32 | $ 41,524.00 |
| 2/19/2004 | 500 | $ | 59.34 | $ 29,670.00 |
| 2/19/2004 | 100 | $ | 59.22 | $ 5,922.00 |
| 2/19/2004 | 500 | $ | 59.35 | $ 29,675.00 |
| 2/19/2004 | 600 | $ | 59.38 | $ 35,628.00 |
| 2/19/2004 | 100 | $ | 59.29 | $ 5,929.00 |
| | **255,000** | | | **$ 16,689,318.00** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Ruth R. McMullin | 11/17/2003 | 530 | $ | 47.75 | $ | 25,307.50 |
| | 11/17/2003 | 4,100 | $ | 47.65 | $ | 195,365.00 |
| | | **4,630** | | | $ | **220,672.50** |
| | | | | | | |
| Kenneth L. Wolfe | 6/15/2004 | 800 | $ | 63.05 | $ | 50,440.00 |
| | 6/15/2004 | 300 | $ | 63.06 | $ | 18,918.00 |
| | 6/15/2004 | 325 | $ | 63.09 | $ | 20,504.25 |
| | 6/15/2004 | 100 | $ | 63.01 | $ | 6,301.00 |
| | 6/15/2004 | 600 | $ | 63.02 | $ | 37,812.00 |
| | 6/15/2004 | 100 | $ | 63.03 | $ | 6,303.00 |
| | 6/15/2004 | 100 | $ | 62.98 | $ | 6,298.00 |
| | 6/15/2004 | 100 | $ | 62.99 | $ | 6,299.00 |
| | 6/15/2004 | 300 | $ | 63.00 | $ | 18,900.00 |
| | 6/15/2004 | 100 | $ | 62.94 | $ | 6,294.00 |
| | 6/15/2004 | 500 | $ | 62.95 | $ | 31,475.00 |
| | 6/15/2004 | 200 | $ | 62.97 | $ | 12,594.00 |
| | 6/15/2004 | 1,900 | $ | 92.90 | $ | 176,510.00 |
| | 2/25/2004 | 1,600 | $ | 58.62 | $ | 93,792.00 |
| | 2/25/2004 | 193 | $ | 58.64 | $ | 11,317.52 |
| | 7/27/2000 | 1,600 | $ | 62.25 | $ | 99,600.00 |
| | | **8,818** | | | $ | **603,357.77** |
| | | | | | | |
| John R. Purcell | 4/30/2004 | 850 | $ | 65.30 | $ | 55,505.00 |
| | 4/26/2004 | 2,000 | $ | 66.10 | $ | 132,200.00 |
| | | **2,850** | | | $ | **187,705.00** |
| | | | | | | |
| Linda Johnson Rice | 4/25/2005 | 2,000 | $ | 74.95 | $ | 149,900.00 |
| | 4/25/2005 | 231 | $ | 75.02 | $ | 17,329.62 |
| | 6/17/2004 | 2,700 | $ | 62.02 | $ | 167,454.00 |
| | 6/17/2004 | 600 | $ | 62.07 | $ | 37,242.00 |
| | 6/17/2004 | 466 | $ | 62.08 | $ | 28,929.28 |
| | 3/2/2004 | 2,000 | $ | 60.59 | $ | 121,180.00 |
| | 3/2/2004 | 399 | $ | 60.61 | $ | 24,183.39 |
| | | **8,396** | | | $ | **546,218.29** |
| | | | | | | |
| John M. Loughlin | 11/10/2005 | 100 | $ | 79.70 | $ | 7,970.00 |
| | 11/10/2005 | 67 | $ | 79.73 | $ | 5,341.91 |
| | 11/10/2005 | 200 | $ | 79.76 | $ | 15,952.00 |
| | 11/10/2005 | 100 | $ | 79.67 | $ | 7,967.00 |
| | 11/10/2005 | 100 | $ | 79.68 | $ | 7,968.00 |
| | 11/10/2005 | 200 | $ | 79.68 | $ | 15,936.00 |
| | 11/10/2005 | 300 | $ | 79.64 | $ | 23,892.00 |
| | 11/10/2005 | 700 | $ | 79.65 | $ | 55,755.00 |
| | 11/10/2005 | 300 | $ | 79.66 | $ | 23,898.00 |
| | 11/10/2005 | 200 | $ | 79.60 | $ | 15,920.00 |
| | 11/10/2005 | 100 | $ | 79.61 | $ | 7,961.00 |
| | 11/10/2005 | 200 | $ | 79.63 | $ | 15,926.00 |
| | 11/10/2005 | 100 | $ | 79.55 | $ | 7,955.00 |
| | 11/10/2005 | 300 | $ | 79.58 | $ | 23,874.00 |
| | 11/10/2005 | 200 | $ | 79.59 | $ | 15,918.00 |

| | | | | | |
|---|---|---|---|---|---|
| 11/10/2005 | 400 | $ | 79.44 | $ | 31,776.00 |
| 11/10/2005 | 100 | $ | 79.48 | $ | 7,948.00 |
| 11/10/2005 | 200 | $ | 79.54 | $ | 15,908.00 |
| 11/10/2005 | 500 | $ | 79.33 | $ | 39,665.00 |
| 11/10/2005 | 200 | $ | 79.40 | $ | 15,880.00 |
| 11/10/2005 | 100 | $ | 79.42 | $ | 7,942.00 |
| 11/10/2005 | 600 | $ | 79.30 | $ | 47,580.00 |
| 11/10/2005 | 200 | $ | 79.31 | $ | 15,862.00 |
| 11/10/2005 | 500 | $ | 79.32 | $ | 39,660.00 |
| 11/10/2005 | 100 | $ | 79.26 | $ | 7,926.00 |
| 11/10/2005 | 500 | $ | 79.30 | $ | 39,650.00 |
| 11/10/2005 | 200 | $ | 79.31 | $ | 15,862.00 |
| 11/10/2005 | 400 | $ | 79.33 | $ | 31,732.00 |
| 11/10/2005 | 100 | $ | 79.27 | $ | 7,927.00 |
| 11/10/2005 | 100 | $ | 79.33 | $ | 7,933.00 |
| 11/10/2005 | 300 | $ | 79.34 | $ | 23,802.00 |
| 11/10/2005 | 300 | $ | 79.34 | $ | 23,802.00 |
| 11/10/2005 | 600 | $ | 79.35 | $ | 47,610.00 |
| 11/10/2005 | 200 | $ | 79.00 | $ | 15,800.00 |
| 11/10/2005 | 200 | $ | 79.09 | $ | 15,818.00 |
| 11/10/2005 | 200 | $ | 79.23 | $ | 15,846.00 |
| 11/10/2005 | 100 | $ | 78.88 | $ | 7,888.00 |
| 11/10/2005 | 700 | $ | 78.91 | $ | 55,237.00 |
| 11/10/2005 | 500 | $ | 78.92 | $ | 39,460.00 |
| 11/10/2005 | 100 | $ | 79.76 | $ | 7,976.00 |
| 11/10/2005 | 100 | $ | 79.54 | $ | 7,954.00 |
| 11/10/2005 | 300 | $ | 79.58 | $ | 23,874.00 |
| 11/10/2005 | 100 | $ | 79.59 | $ | 7,959.00 |
| 11/10/2005 | 200 | $ | 79.40 | $ | 15,880.00 |
| 11/10/2005 | 200 | $ | 79.40 | $ | 15,880.00 |
| 11/10/2005 | 400 | $ | 79.44 | $ | 31,776.00 |
| 11/10/2005 | 600 | $ | 79.35 | $ | 47,610.00 |
| 11/10/2005 | 100 | $ | 79.39 | $ | 7,939.00 |
| 11/10/2005 | 100 | $ | 79.39 | $ | 7,939.00 |
| 11/10/2005 | 100 | $ | 79.68 | $ | 7,968.00 |
| 11/10/2005 | 100 | $ | 79.60 | $ | 7,960.00 |
| 11/10/2005 | 100 | $ | 79.63 | $ | 7,963.00 |
| 11/10/2005 | 200 | $ | 79.64 | $ | 15,928.00 |
| 11/10/2005 | 600 | $ | 79.65 | $ | 47,790.00 |
| 11/10/2005 | 300 | $ | 79.66 | $ | 23,898.00 |
| 11/9/2005 | 100 | $ | 79.40 | $ | 7,940.00 |
| 8/10/2005 | 3,100 | $ | 80.64 | $ | 249,984.00 |
| 8/10/2005 | 500 | $ | 80.65 | $ | 40,325.00 |
| 8/10/2005 | 900 | $ | 80.70 | $ | 72,630.00 |
| 8/10/2005 | 500 | $ | 80.75 | $ | 40,375.00 |
| 8/10/2005 | 400 | $ | 80.78 | $ | 32,312.00 |
| 8/10/2005 | 133 | $ | 80.63 | $ | 10,723.79 |
| 8/10/2005 | 2,400 | $ | 80.66 | $ | 193,584.00 |
| 8/10/2005 | 1,800 | $ | 80.69 | $ | 145,242.00 |
| 8/10/2005 | 400 | $ | 80.50 | $ | 32,200.00 |
| 8/10/2005 | 8,200 | $ | 80.60 | $ | 660,920.00 |

|  | 5/10/2005 | 400 | $ | 76.05 | $ | 30,420.00 |
|---|---|---|---|---|---|---|
|  | 5/10/2005 | 1,100 | $ | 76.06 | $ | 83,666.00 |
|  | 5/10/2005 | 1,000 | $ | 76.11 | $ | 76,110.00 |
|  | 5/10/2005 | 800 | $ | 76.10 | $ | 60,880.00 |
|  | 5/10/2005 | 500 | $ | 76.08 | $ | 38,040.00 |
|  | 5/10/2005 | 2,000 | $ | 76.20 | $ | 152,400.00 |
|  | 5/10/2005 | 8,100 | $ | 76.15 | $ | 616,815.00 |
|  | 5/10/2005 | 1,100 | $ | 76.13 | $ | 83,743.00 |
|  | 2/10/2005 | 500 | $ | 72.68 | $ | 36,340.00 |
|  | 2/10/2005 | 2,500 | $ | 72.67 | $ | 181,675.00 |
|  | 2/10/2005 | 300 | $ | 72.75 | $ | 21,825.00 |
|  | 2/10/2005 | 100 | $ | 72.71 | $ | 7,271.00 |
|  | 2/10/2005 | 400 | $ | 72.70 | $ | 29,080.00 |
|  | 2/10/2005 | 400 | $ | 72.82 | $ | 29,128.00 |
|  | 2/10/2005 | 200 | $ | 72.80 | $ | 14,560.00 |
|  | 2/10/2005 | 200 | $ | 72.77 | $ | 14,554.00 |
|  | 2/10/2005 | 200 | $ | 72.86 | $ | 14,572.00 |
|  | 2/10/2005 | 300 | $ | 72.84 | $ | 21,852.00 |
|  | 2/10/2005 | 700 | $ | 72.83 | $ | 50,981.00 |
|  | 2/10/2005 | 900 | $ | 72.90 | $ | 65,610.00 |
|  | 2/10/2005 | 800 | $ | 72.88 | $ | 58,304.00 |
|  | 2/10/2005 | 200 | $ | 72.87 | $ | 14,574.00 |
|  | 2/10/2005 | 1,500 | $ | 72.93 | $ | 109,395.00 |
|  | 2/10/2005 | 4,000 | $ | 72.92 | $ | 291,680.00 |
|  | 2/10/2005 | 700 | $ | 72.91 | $ | 51,037.00 |
|  | 2/10/2005 | 600 | $ | 72.96 | $ | 43,776.00 |
|  | 2/10/2005 | 1,300 | $ | 72.95 | $ | 94,835.00 |
|  | 2/10/2005 | 1,700 | $ | 72.94 | $ | 123,998.00 |
|  | 2/10/2005 | 200 | $ | 73.03 | $ | 14,606.00 |
|  | 2/10/2005 | 600 | $ | 73.01 | $ | 43,806.00 |
|  | 2/10/2005 | 600 | $ | 73.00 | $ | 43,800.00 |
|  | 2/10/2005 | 100 | $ | 73.06 | $ | 7,306.00 |
|  | 2/10/2005 | 600 | $ | 73.05 | $ | 43,830.00 |
|  | 2/10/2005 | 100 | $ | 73.04 | $ | 7,304.00 |
|  | 2/10/2005 | 700 | $ | 73.43 | $ | 51,401.00 |
|  | 2/10/2005 | 4,182 | $ | 73.38 | $ | 306,875.16 |
|  | 2/10/2005 | 700 | $ | 73.20 | $ | 51,240.00 |
|  | 2/10/2005 | 300 | $ | 72.65 | $ | 21,795.00 |
|  | 2/10/2005 | 200 | $ | 72.61 | $ | 14,522.00 |
|  | 2/10/2005 | 200 | $ | 72.64 | $ | 14,528.00 |
|  | 2/10/2005 | 600 | $ | 72.63 | $ | 43,578.00 |
|  | 2/10/2005 | 100 | $ | 72.62 | $ | 7,262.00 |
|  | 11/10/2004 | 4,680 | $ | 61.30 | $ | 286,884.00 |
|  | 8/10/2004 | 1,191 | $ | 60.64 | $ | 72,222.24 |
|  | 5/10/2004 | 2,372 | $ | 61.50 | $ | 145,878.00 |
|  | 2/20/2004 | 2,858 | $ | 58.28 | $ | 166,564.24 |
|  | 11/21/2003 | 5,000 | $ | 47.39 | $ | 236,939.00 |
|  |  | **90,283** |  |  | $ | **6,600,739.34** |
| Stephen C. McCluski | 8/10/2005 | 900 | $ | 80.70 | $ | 72,630.00 |
|  | 8/10/2005 | 100 | $ | 80.71 | $ | 8,071.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 8/10/2005 | 600 | $ | 80.75 | $ | 48,450.00 |
| | 8/10/2005 | 2,500 | $ | 80.66 | $ | 201,650.00 |
| | 8/10/2005 | 100 | $ | 80.67 | $ | 8,067.00 |
| | 8/10/2005 | 1,900 | $ | 80.69 | $ | 153,311.00 |
| | 8/10/2005 | 400 | $ | 80.78 | $ | 32,312.00 |
| | 8/10/2005 | 400 | $ | 80.50 | $ | 32,200.00 |
| | 8/10/2005 | 100 | $ | 80.59 | $ | 8,059.00 |
| | 8/10/2005 | 14,500 | $ | 80.60 | $ | 1,168,700.00 |
| | 8/10/2005 | 3,100 | $ | 80.64 | $ | 249,984.00 |
| | 8/10/2005 | 600 | $ | 80.65 | $ | 48,390.00 |
| | 2/15/2005 | 5,239 | $ | 72.90 | $ | 381,923.10 |
| | 11/10/2004 | 22,200 | $ | 61.50 | $ | 1,365,300.00 |
| | 11/3/2004 | 5,000 | $ | 60.90 | $ | 304,500.00 |
| | 8/3/2004 | 4,500 | $ | 61.50 | $ | 276,750.00 |
| | 3/8/2004 | 5,280 | $ | 60.64 | $ | 320,179.20 |
| | 12/8/2003 | 3,200 | $ | 51.75 | $ | 165,600.00 |
| | 12/8/2003 | 868 | $ | 51.89 | $ | 45,040.52 |
| | | **71,487** | | | $ | **4,891,116.82** |
| | | | | | | |
| Dwain L. Hahs | 8/15/2005 | 5,000 | $ | 80.80 | $ | 404,000.00 |
| | 5/16/2005 | 5,407 | $ | 75.40 | $ | 407,687.80 |
| | 2/15/2005 | 2,913 | $ | 72.90 | $ | 212,357.70 |
| | 2/15/2005 | 300 | $ | 72.85 | $ | 21,855.00 |
| | 2/15/2005 | 1,700 | $ | 72.82 | $ | 123,794.00 |
| | | **15,320** | | | $ | **1,169,694.50** |
| | | | | | | |
| Angela J. Panzarella | 3/7/2005 | 900 | $ | 72.14 | $ | 64,926.00 |
| | 3/7/2005 | 600 | $ | 72.16 | $ | 43,296.00 |
| | 3/7/2005 | 210 | $ | 72.18 | $ | 15,157.80 |
| | 6/14/2004 | 480 | $ | 62.77 | $ | 30,129.60 |
| | | **2,190** | | | $ | **153,509.40** |
| | | | | | | |
| Robert B. Stiles | 6/27/2005 | 10,000 | $ | 80.00 | $ | 800,000.00 |
| | 4/22/2005 | 20,000 | $ | 75.07 | $ | 1,501,400.00 |
| | 4/21/2005 | 2,580 | $ | 75.00 | $ | 193,500.00 |
| | 4/2/2005 | 3,222 | $ | 74.13 | $ | 238,846.86 |
| | 2/1/2005 | 2,280 | $ | 72.95 | $ | 166,326.00 |
| | 12/16/2004 | 1,980 | $ | 65.00 | $ | 128,700.00 |
| | 11/5/2004 | 1,191 | $ | 62.00 | $ | 73,842.00 |
| | 8/9/2004 | 1,720 | $ | 61.20 | $ | 105,264.00 |
| | 6/3/2004 | 3,500 | $ | 65.00 | $ | 227,500.00 |
| | 5/10/2004 | 5,980 | $ | 61.50 | $ | 367,770.00 |
| | 2/19/2004 | 2,736 | $ | 59.05 | $ | 161,560.80 |
| | | **55,189** | | | $ | **3,964,709.66** |
| | | | | | | |
| Kamal Sarbadhikari | 5/9/2005 | 2,100 | $ | 76.50 | $ | 160,650.00 |
| | 4/27/2005 | 23,800 | $ | 75.80 | $ | 1,804,040.00 |
| | 4/22/2005 | 300 | $ | 75.44 | $ | 22,632.00 |
| | 4/22/2005 | 4,100 | $ | 75.40 | $ | 309,140.00 |
| | 4/21/2005 | 100 | $ | 75.75 | $ | 7,575.00 |
| | 4/21/2005 | 1,700 | $ | 75.76 | $ | 128,792.00 |

|  | | | | |
|---|---:|---|---:|---:|
|  | 2/3/2005 | 500 | $ 74.00 | $ 37,000.00 |
|  | 2/3/2005 | 4,500 | $ 73.83 | $ 332,235.00 |
|  |  | **37,100** |  | **$ 2,802,064.00** |
| Geoffrey F. Ide | 5/4/2005 | 1,900 | $ 75.03 | $ 142,557.00 |
|  | 5/4/2005 | 100 | $ 75.06 | $ 7,506.00 |
|  | 5/4/2005 | 400 | $ 75.05 | $ 30,020.00 |
|  | 5/4/2005 | 700 | $ 75.04 | $ 52,528.00 |
|  | 5/4/2005 | 200 | $ 75.12 | $ 15,024.00 |
|  | 5/4/2005 | 1,300 | $ 75.11 | $ 97,643.00 |
|  | 5/4/2005 | 1,500 | $ 75.10 | $ 112,650.00 |
|  | 5/4/2005 | 200 | $ 75.17 | $ 15,034.00 |
|  | 5/4/2005 | 100 | $ 75.16 | $ 7,516.00 |
|  | 5/4/2005 | 100 | $ 75.14 | $ 7,514.00 |
|  | 5/4/2005 | 3,100 | $ 75.21 | $ 233,151.00 |
|  | 5/4/2005 | 3,200 | $ 75.20 | $ 240,640.00 |
|  | 5/4/2005 | 500 | $ 75.19 | $ 37,595.00 |
|  | 5/4/2005 | 900 | $ 75.24 | $ 67,716.00 |
|  | 5/4/2005 | 300 | $ 75.23 | $ 22,569.00 |
|  | 5/4/2005 | 100 | $ 75.22 | $ 7,522.00 |
|  | 5/4/2005 | 400 | $ 75.28 | $ 30,112.00 |
|  | 5/4/2005 | 400 | $ 75.27 | $ 30,108.00 |
|  | 5/4/2005 | 3,800 | $ 75.25 | $ 285,950.00 |
|  | 5/4/2005 | 500 | $ 75.31 | $ 37,655.00 |
|  | 5/4/2005 | 1,200 | $ 75.30 | $ 90,360.00 |
|  | 5/4/2005 | 1,100 | $ 75.29 | $ 82,819.00 |
|  | 5/4/2005 | 400 | $ 75.37 | $ 30,148.00 |
|  | 5/4/2005 | 1,200 | $ 75.35 | $ 90,420.00 |
|  | 5/4/2005 | 3,400 | $ 75.32 | $ 256,088.00 |
|  | 5/4/2005 | 500 | $ 75.45 | $ 37,725.00 |
|  | 5/4/2005 | 1,900 | $ 75.40 | $ 143,260.00 |
|  | 5/4/2005 | 1,600 | $ 75.38 | $ 120,608.00 |
|  | 10/28/2004 | 2,500 | $ 59.95 | $ 149,875.00 |
|  |  | **33,500** |  | **$ 2,482,313.00** |
|  | **TOTAL** | **741,042** |  | **$ 51,338,676.78** |

## DEFENDANTS AGREE TO SELL THE COMPANY IN EXCHANGE FOR INDEMNIFICATION AND PERSONAL BENEFITS

### Background of the Warburg Merger

115.    In July 2006, in the midst of turmoil over accounting problems and financial restatements and following the May, 2006 worldwide recall of Bausch & Lomb's leading product – ReNu with MoistureLoc contact lens cleaner – the Current Director Defendants began discussions with Warburg Pincus concerning the possibility of an acquisition of the Company.

116.    At that time, "[t]he Board concluded that, due to the uncertainties arising out of the Company's various contingent liabilities, and in particular the MoistureLoc related litigation, and the unavailability of current financial information concerning the Company due to the continued delay in the filing of the Company's financial statements, it would be difficult for any potential acquirer – whether financial or strategic – to evaluate the Company with respect to a potential acquisition."

117.    The Board also "believed that a publicly announced auction of the Company that did not result in a transaction at an attractive price could be very damaging to the Company."

118.    Nonetheless, on August 25, 2006, the Board, clearly favoring Warburg Pincus (for reasons more fully discussed below), entered into a confidentiality agreement with Warburg Pincus to evaluate a possible acquisition proposal, thereby giving it an ***eight month*** head start over any other potential suitors to conduct due diligence in connection with  possible buyout of the Company.

119.    In contrast to the preferential treatment bestowed upon Warburg Pincus by the Current Director Defendants, in mid-October 2006, the Company rebuffed a written proposal from Advanced Medical Optics, Inc. ("AMO") expressing an interest in possibly acquiring the Company at a purchase price "in excess of $60 per share," consisting of cash and stock.  "At the request of the Board of Directors, Mr. Zarrella informed AMO that, in light of the Company's pending restatement and delayed financial filings, it was not an appropriate time to engage in discussions with respect to a potential transaction."  Nonetheless, despite rebuffing AMO using this pretext, Bausch & Lomb continued to pursue a sale of the Company to Warburg.

120.    On January 30, 2007, with an eye towards a proposed transaction with Warburg Pincus, the Board established a "Special Committee" consisting of defendants Waltrip (Chairman), Linen and De Sole to "review, analyze and make recommendations" to the Board concerning an acquisition by Warburg Pincus and to "retain such financial, legal and other advisors at it deemed necessary and appropriate."  On that same date, the Board reaffirmed its view that "a publicly announced auction of the Company that did not result in an attractive proposal could be very damaging to the Company."

121.    On the very same day the Special Committee was formed and apparently without any competitive process for the selection of a financial advisor, "the Special Committee met and approved the engagement of Morgan Stanley" as its financial advisors.

122.    The retention of Morgan Stanley is suspect.  According to the 2004 Schedule 14A proxy statement, Morgan Stanley owned 9.4% of Bausch & Lomb's stock.  According to the 2005 Schedule 14A proxy statement, Morgan Stanley owned 7.6% of Bausch & Lomb's outstanding stock which it sold in June 2006, just before Warburg approached defendant Zarrella about a possible deal.

123.    The Special Committee met in February and March of 2007 with Morgan Stanley & Co. Incorporated ("Morgan Stanley") to review its status of and due diligence with respect to the Company.

124.    In April 2007, Warburg Pincus contacted unnamed potential financing sources and commenced sharing with them the due diligence materials they had obtained.  Notably, on April 23, 2007, there was "unusual trading activity in the Company's stock" which the Company attributed to "press reports of rumors regarding potential acquisition of the Company."[2]

125.    On April 27, 2007, Warburg Pincus submitted its initial formal proposal to acquire Bausch & Lomb for merely $60.00 per share.  This price was no surprise given that AMO's previously rebuffed overtures had set a minimum floor for offers the Company.  The Special Committee concluded that the proposal was inadequate.  Consequently, the Board rejected Warburg Pincus' initial proposal.

126.    During the week of April 30, 2007, undisclosed members of Bausch & Lomb's management and representatives of Morgan Stanley met with Warburg Pincus and representatives of one of Warburg Pincus' financial advisors "to discuss differences in assumptions and

---

[2] An article in *The Wall Street Journal* on July 10, 2007, notes that "Bausch & Lomb's explanation of questionable trading in its shares raises more questions than it answers.... The company attributes the 13% increase in its shares on April 23 to 'press reports of rumors regarding a potential acquisition of the company.' But press reports, including one from Reuters and this post from Deal Journal, only cropped up after the shares started moving.  (A Factiva search of media reports on that day and the day before produced no pieces of original press reporting on a possible deal for Bausch. & Lomb).

methodologies affecting Warburg Pincus's valuations of the Company." At this meeting, the portion of a five year financial forecast prepared by management at a date unknown relating to the 2008 fiscal year was shared with Warburg Pincus.

127.    On May 4, 2007, Warburg submitted a revised proposal to acquire the Company for $63 in cash per share. This proposal was set to expire by the close of business on May 9, 2007. The following day, Morgan Stanley and the Special Committee's legal advisors made presentations to the Board and Special Committee concerning the revised proposal. The Special Committee once again concluded that $63 was inadequate. However, "the Board of Directors requested that during the time available prior to the expiration of the $63 Warburg Pincus Proposal, Morgan Stanley, with the assistance of management as necessary, should refine the analysis of the theoretical valuation of the Company if it were to remain independent under various assumptions."

128.    On May 8, 2007, during a telephonic meeting of the Special Committee, Morgan Stanley "presented the additional analysis that had been requested at the May 5 Board of Directors meeting." Further, the Special Committee was informed that a strategic bidder was possibly considering an unsolicited bid for the Company. After further discussion, the Special Committee decided to recommend to the Board that Warburg Pincus be advised that the $63 offer was inadequate. However, to ensure that Warburg Pincus remained the front runner in the Current Director Defendants' race to sell the Company and to convey the urgency with which they needed to act in order to shore up their plan to acquire Bausch & Lomb, Warburg Pincus was informed that a strategic bidder was considering an unsolicited bid for the Company, and that Warburg Pincus should submit "its best and final offer."

129.    Two days later, on May 10, 2007, Warburg Pincus submitted a further revised proposal to acquire the Company – this time for $65 in cash per share. The offer was conditioned in part on a termination fee and a right on the part of Warburg to match any competing proposal.

130.    The very next day, on May 11, 2007, clearly eager to approve any transaction that involved Warburg Pincus, "Morgan Stanley representatives confirmed that, if requested, Morgan Stanley would be in a position to deliver an opinion that the $65 Warburg Pincus proposal was fair to the Company's shareholders from a financial point of view." The Special Committee also decided

to recommend that the Board accept the $65 proposal if Warburg Pincus agreed to a minimum 50 days for the "go shop" period, termination fees of $120 million or $40 million in the event of a termination in favor of a superior proposal.

131.    On May 16, 2007, the stock of the Company closed at $67.37 per share, well above the price offered in the Warburg Merger.  This demonstrates that the market viewed the price as inadequate.  Indeed, on July 5 and 6 Bausch & Lomb's stock price closed at $72 per share.  However, to maintain the illusion of a fair process and of negotiation designed to maximize value for the Company, the Board requested a meager price increase to $66 in cash per share in conjunction with the extended 50 day "go shop" period and revised termination fees.  Warburg Pincus rejected the proposed increase and the Current Director Defendants immediately accepted the lower $65 bid.

132.    On May 15, 2007, Morgan Stanley rendered its fairness opinion declaring that the Warburg Merger was fair to the Company's shareholders from a financial point of view and the definitive documentation for the Warburg Merger was finalized.  The transaction was publicly announced on May 16, 2007.

**AMO's Attempt to Obtain True Shareholder Value for Bausch & Lomb Shareholders**

133.    As discussed above, AMO first expressed an interest in acquiring Bausch & Lomb in October 2006, but was quickly rebuffed by defendant Zarella who stated "it was not an appropriate time to engage in discussions with respect to a potential transaction."  Nonetheless, on May 25, 2007, AMO publicly announced its interest in exploring the possibility of making an offer for the Company.  A few weeks later, AMO submitted an initial proposal to acquire the Company for an amount well in excess of that contemplated by the Warburg Merger.

134.    On June 29, 2007, after discussions among advisors for AMO and the Special Committee, AMO submitted a revised proposal wherein it sought to acquire 100% of the outstanding shares of the Company for $75 per share, consisting of $45 in cash and $30 in AMO stock, valued based on the average closing price of AMO common stock for five trading days prior to the date on which a definitive agreement would be signed.

135. Then, on July 3, 2007, Bausch & Lomb sent AMO a letter requesting AMO address certain issues with respect to its proposal. AMO complied and provided additional information to the Special Committee which addressed certain issues raised in the Company's July 3, 2007 letter.

136. On July 5, 2007, the Company issued a press release which announced that the Board had determined that "the AMO Proposal is bona fide and is reasonably likely to result in a superior proposal" and therefore "intend[ed] to engage in further discussions with AMO regarding the AMO Proposal." The Company also announced that AMO was designated as an "excluded party" for purposes of the Warburg Pincus merger agreement. This designation allowed the Special Committee to continue to negotiate with AMO beyond the "go shop" period. Nevertheless, "the Board of Directors, upon the recommendation of the Special Committee, did not change, and reaffirmed, its recommendation of the [Warburg Merger]."

137. On July 10, 2007, the Company filed a Preliminary Proxy Statement ("Preliminary Proxy") with the SEC. By such filing, the Director Defendants demonstrated that they were ready, willing and able to consummate the Warburg Merger despite AMO's superior proposal.

138. Thereafter, Bausch & Lomb and AMO engaged in an extensive letter writing campaign whereby the Special Committee and its advisors made ongoing, unusual requests to AMO in a transparent attempt to discourage AMO from pursuing a bid, leaving Warburg Pincus and its inadequate proposal on the table. For example, on July 18, 2007, defendant Waltrip wrote to James V. Mazzo, AMO's Chairman, President and CEO, and requested, in part, assurances from Mr. Mazzo as to the "likelihood of consummation of the AMO Proposal, particularly as it relates to obtaining regulatory approval and the approval of the AMO shareholders," as well as further information to assess the value of the stock component of AMO's proposal. Defendant Waltrip also made clear that "without further information and assurances satisfactory to the Special Committee and the Board, the Special Committee could very well reach the conclusion that AMO no longer meets the standard to be an excluded party under the Warburg Pincus agreement." In response, Mr. Mazzo replied on July 23, 2007, expressing his surprise of the content of the letter because AMO and the Special Committee and its advisors had numerous conference calls addressing various concerns raised in the July 18 letter. Mr. Mazzo once again fully assured the Special Committee of its commitment to

acquire Bausch & Lomb and stressed the superior value of its proposal as compared to the Warburg Pincus proposal.  In addition, Mr. Mazzo explained that AMO had already provided Bausch & Lomb with significant access to business, legal and accounting diligence and had participated in at least ten in-depth conference calls with the Special Committee's advisors, to substantiate, in part, the value of AMO's stock component.  Mr. Mazzo also stated that he did not believe a "pre-signing referendum" of AMO's stockholders concerning a "transaction that has not been fully negotiated" and "about which they did not have sufficient information to make an informed decision" would "provide the Special Committee with meaningful information that would be dispositive."  Nonetheless, Mr. Mazzo reiterated AMO's willingness to negotiate the terms of a definitive merger agreement as whole "at any time that you wish."

139.    Also on July 23, 2007, Morgan Stanley presented its analysis of the AMO proposal to the Special Committee, but did not render, and was not asked by the Board to render, a fairness opinion with respect to AMO's proposal.  Notably, despite its efforts to devalue AMO's proposal, Morgan Stanley found that the AMO proposal resulted in a potential value of $70.71 per Company share, more than five dollars greater than the Warburg Pincus proposal.

140.    The Special Committee met after Morgan Stanley's presentation and discussed the AMO proposal.  Despite Mr. Mazzo's ongoing attempts to provide the Special Committee with the information it requested and thereby continue negotiations, the Special Committee determined that "it was not clear that further negotiations would be productive" and decided to recommend to the Board that it was unable to conclude, despite Morgan Stanley's analysis, that the AMO proposal was more favorable to Bausch & Lomb shareholders from a financial point of view, or that the proposal was "reasonable capable of being consummated."   Accordingly, the Special Committee recommended that AMO should no longer be designated as an "excluded party" under the Warburg Pincus agreement.

141.    On July 24, 2007, the Special Committee and the Board sent Mr. Mazzo a letter explaining that in order to maintain its designation as an "excluded party," AMO must provide "further assurances as to value and certainty of consummation … [and] concrete, credible evidence

that holders of a significant percentage of the outstanding AMO shares would affirmatively support the proposed acquisition."

142.    On July 26, 2007, two of Bausch & Lomb's large shareholders, Sandell Asset Management Corp. and HealthCor Management L.P., each sent a letter to the Board and expressed their opinion that the AMO proposal was a superior offer and their intention to vote against the adoption of the Warburg Pincus agreement.

143.    Mr. Mazzo, on behalf of AMO, responded to the Special Committee's July 24, 2007 letter on July 27, 2007.  Mr. Mazzo agreed to increase AMO's proposed reverse termination fee to $50 million and proposed two alternatives to satisfy the Special Committee's request for proof of shareholder support of the AMO proposal.  The first alternative was to discuss the transaction in detail with AMO's principal shareholders once AMO received a limited waiver of its confidentiality agreement from Bausch & Lomb.  The second was for Bausch & Lomb to postpone its vote, thereby necessitating an amendment to the Warburg Pincus agreement, while AMO and Bausch & Lomb would enter into a separate merger agreement to be presented for vote by AMO shareholders and letting corporate democracy function as it should.

144.    On July 29, 2007, the Special Committee responded and granted AMO a limited waiver of confidentiality, explained that the $50 million reverse termination fee was inadequate and advised AMO that Warburg Pincus refused to amend its merger agreement pursuant to AMO's second alternative, which would let AMO's shareholders make the decision.  The Special Committee once again asked for additional information regarding value and merger consummation and requested Mr. Mazzo provide "concrete, credible evidence of AMO's ability to secure AMO stockholder approval no later than 12:00 p.m., on Friday, August 3, 2007."

145.    Immediately thereafter, Mr. Mazzo responded to the Special Committee's July 29, 2007 letter and requested, in part, an extension of a few weeks to obtain shareholder support.  Mr. Mazzo explained that the Special Committee's request was "extremely unusual" and "cannot be realistically accomplished within the time frame or disclosure limitation" proposed.  Further, Mr. Mazzo candidly pointed out that Bausch & Lomb's shareholders had months to assess the Warburg Pincus agreement, not the mere four days which the Special Committee imposed upon AMO.  Mr.

Mazzo also set forth various inconsistencies concerning the standard as to what level of affirmative AMO stockholder support the Special Committee sought.

146.    On August 1, 2007, the Special Committee declined Mr. Mazzo's request for an extension.  Later that same day, Mr. Mazzo responded as follows:

> It is clear from the way the special committee has run the go-shop process and the unrealistic hurdles that have been uniquely imposed on Advanced Medical Optics, Inc. ("AMO") that you do not have any interest in providing your shareholders with the opportunity to receive the $75 per share offer that we have proposed ... Instead, you remain intent on delivering Bausch & Lomb to Warburg Pincus at $65 per share, a transaction that is inferior to AMO's proposal both in terms of value and the ability for the Bausch & Lomb shareholders to participate in the significant synergies that combining AMO and Bausch & Lomb would create .... Accordingly, we have withdrawn our offer. If, in the future, you decide to run a process that is designed to deliver value to your shareholders, please let us know.

147.    Also on August 1, 2007, but apparently prior to receiving Mr. Mazzo's responsive letter, Bausch & Lomb filed an amended Preliminary Proxy for the Warburg Pincus merger agreement.  Notably, this proxy contained many additional disclosures, the omission of which were raised by plaintiff Gaetano Rainone ("Rainone") in his Second Amended Verified Shareholder Derivative and Class Action Complaint ("SAC") which was submitted to the Court on July 24, 2007, in connection with another shareholder class and derivative action pending in this District under Lead Civil Action No. 06CV6298-MAT-MWP.  Then, on August 3, 2007, Bausch & Lomb filed an additional amended Preliminary Proxy which, in part, disclosed AMO's withdrawal of its proposal and set the shareholder vote date for September 21, 2007.  The Definitive Proxy Statement ("Definitive Proxy") was filed shortly thereafter on August 14, 2007.

**The Current Director Defendants are Conflicted**

148.    On May 16, 2007, the defendants announced the Warburg Merger in which shareholders of Bausch & Lomb will be divested of their equity interest in Bausch & Lomb for a paltry $65 per share in cash.  In total, Warburg Pincus will usurp control of Bausch & Lomb for a mere $4.5 billion, including approximately $830 million in debt.

149.    Commenting on the proposed transaction, defendant Zarrella stated:

> We believe this transaction with Warburg Pincus is good for the Company's employees, partners in the eye care profession, and customers, as well as our

shareholders. As a private company, Bausch & Lomb will have greater flexibility to focus on our long-term strategic direction to be a global leader in providing innovative and technologically advanced eye health products to eye care professionals and consumers. We are proud to partner with Warburg Pincus, a distinguished firm with a strong reputation and proven track record of success in acquiring and guiding healthcare companies. Warburg Pincus understands our industry and our business well, and will be a tremendous asset as we build upon our leadership position and continue to implement our strategic plan to deliver enhanced value for our customers worldwide. The firm shares our confidence in Bausch & Lomb's future and will support our people in achieving our long-term goals. Our success is driven by the ongoing efforts of our talented employees around the world and I thank them for their continued hard work and dedication. We look forward to working with Warburg Pincus to quickly complete the transaction

150.    The Warburg Merger, however, appears rife with conflict.  In response to the proposed transaction, the Company's Board formed a Special Committee to review and evaluate the proposal.  The Board also hired Morgan Stanley to serve as financial advisor in connection with the analysis of the Warburg Merger.

151.    The choice of Morgan Stanley to act as advisor to the purported "independent" Special Committee creates impermissible conflicts of interest.  Morgan Stanley has, in the past, provided services to Bausch & Lomb, whose management is not independent in the Warburg Merger.  Indeed, in July 2003, Morgan Stanley was one of the initial purchasers of the Company's $140 million sale of Floating Rate Convertible Senior Notes due 2023, and purchased $28 million.

152.    Moreover, although Bausch & Lomb characterizes the fee being paid to Morgan Stanley as "customary", it ranks as the third highest fee paid to an advisor in a survey of 32 similar deals.  At 0.525% of the $4.5 billion transaction, this equates to a total fee of $23.6 million.

153.    Even more egregious, Warburg Pincus and Morgan Stanley have a close working relationship that compromises Morgan Stanley's independence as an advisor to Bausch & Lomb's Special Committee.  In the past few months, Morgan Stanley has served as an exclusive adviser to Warburg Pincus in a number of large transactions.  For example, in April of this year it was reported that Morgan Stanley is advising Warburg Pincus in Warburg Pincus' $625 million investment in Marshall & Ilsley.  Similarly, in March of this year it was reported that Morgan Stanley advised Warburg Pincus in Warburg Pincus's $175 million investment in Titan Petrochemicals Group Limited. Since 2006, Morgan Stanley has received "in excess of $65 million in fees  from Warburg. "Moreover, Morgan Stanley anticipates it will continue working with Warburg Pincus in the future.

154.     The Current Director Defendants are similarly conflicted, defendant Linen, a member of the Special Committee, serves on the board of directors of Yum! Brands, Inc. along with David W. Dorman, senior adviser to Warburg Pincus and defendant Zarrella serves on the Board of Trustees of the CED with W. Bowman Cutter, managing director of Warburg Pincus.  Zarrella also serves as a member of the board of directors of Avaya, Inc. along with Joseph L. Landy, Co-President and member of the Executive Management Committee of Warburg Pincus.

155.     Moreover, defendant Purcell served as a director of OmniCom Group, with defendant Johnson Rice, along with Errol M. Cook, a managing director of Warburg Pincus for eight years.

156.     Defendant McMullin, as Chairperson of Eagle-Picher Industries, Inc.  Personal Injury Settlement Trust, was one of the signatories to an acquisition of Eagle-Picher, with financing provided by Warburg Pincus and others.

157.     Although the Current Director Defendants have a duty to maximize shareholder value, they have clear and material conflicts of interest and are acting to better their own interests or those of the Company's management at the expense of Bausch & Lomb's public shareholders.

158.     Notably, each of the Individual Defendants stands to benefit from the sale of the Company in that it will discharge them of personal liability for the shareholder derivative claims asserted in this and other actions.  Hence, the Current Director Defendants are acting to insulate from liability themselves and the other Individual Defendants to whom they remain loyal by negotiating the sale of the Company to Warburg Pincus at an unfair price and through a process that is fundamentally flawed and beset with conflicts..

159.     The Warburg Merger is also unfair because it provides for disparate and superior consideration to the Individual Defendants, some of whom may be offered equity participation in the new entity.  In contrast, Bausch & Lomb's public shareholders will lose their equity interest in the Company and will be deprived of fair and adequate compensation for their shares.

160.     In addition to the valuable benefits of eliminating millions of dollars of personal liability, the Individual Defendants will cash-out all unvested Company equity and other long-term compensation awards which, based on holdings as of August 10, 2007, would result in an estimated aggregate cash payment to the Current Director Defendants and executive officers of approximately $7.7 million.

161.     When the Warburg Merger was first announced, Matthew Sherman, a spokesman for Bausch & Lomb, declined to comment on whether the Company's current management, including defendant Zarrella, would remain in place after the deal is completed.  However, the Definitive Proxy reveals that "it is likely that certain members of [Bausch & Lomb's] current management team will enter into arrangements with [Warburg Pincus] or its affiliates regarding employment [] with, and the right to purchase or participate in the equity of [Warburg Pincus]." This is hardly surprising, given that any qualifying terminations of employment of the Individual Defendants in connection with or following the Warburg Merger would trigger the payment of valuable change of control severance benefits pursuant to agreements with Bausch & Lomb's executive officers.  Indeed, the estimated aggregate cash severance payment under these agreements and the value of certain ancillary severance benefits and tax "gross-up" payment would be approximately $61.5 million.

162.     Moreover, if the Warburg Merger is consummated, the Individual Defendants will receive continued indemnification and insurance coverage for six years following the closing under the merger agreement.

163.     In sum, the Warburg Merger will deny plaintiff and other members of the Class the right to share proportionately in the future success and growth in profitability of Bausch & Lomb and its valuable assets while permitting the Individual Defendants to reap huge benefits from the contemplated transaction.

164.     As the Current Director Defendants have unlawfully placed their own interests ahead of Bausch & Lomb's shareholders, absent judicial intervention the consummation of the Warburg Merger will result in irreparable harm.

**The Current Director Defendants Failed to Maximize Shareholder Value**

165.    The $65 cash per share offered in the Warburg Merger is unfair and grossly inadequate because, among other things, the intrinsic value of Bausch & Lomb's common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.  In fact, on May 9, 2007, the Company announced that its first quarter net income surged 62 percent as its steroid eye drops for treating inflamed eyes, ocular vitamins and Retiser drug-delivery implants led to an increase in sales.

166.    Furthermore, it is unclear whether any consideration has been given to or any valuation put on the Company's claims contained in this action and whether or not it is included in the $65 per share price.

167.    Most notably, the financial restatements and accounting problems combined with lingering internal investigations and product recalls – a direct result of the Individual Defendants' breaches of fiduciary duties – have caused the Company's stock to trade well below the value of its assets and its future business prospects.  Rather than consider a strategic alternative which would have allowed the Company to continue in existence and allowed its shareholders to enjoy the benefits of the Company when it fully emerges from its current distress, the Current Director Defendants sought a buyer willing to discharge the Individual Defendants' liability for the breaches of fiduciary duties detailed herein, thereby attempting to pull the rug out from beneath this shareholder derivative action.

168.    In fact, *BusinessWeek* reported on May 16, 2007 that:

The deal 'is a way to get them out of the public spotlight and take care of the issues they need to address,' said Jeff Johnson, an analyst at Robert W. Baird & Co.. Bausch & Lomb faces almost 350 lawsuits from customers affected by the ReNu problems. They also have faced accounting problems. Full results from 2006 have been delayed.

169.    However, because the Individual Defendants' primary motivation has been to escape personal liability and maximize their own financial interests, they have ignored and utterly failed in their duty to obtain the highest value reasonably available for the Company's stockholders.  Indeed, the Definitive Proxy makes it quite clear that the Individual Defendants' motivation includes the extinguishment of the shareholder derivative claims when it acknowledges that "[i]f the merger is

consummated, any shareholder derivative claims that are currently asserted by existing shareholders against the directors and officers of the Company would be subject to dismissal on standing grounds." Thus, the Warburg Merger constitutes an improper attempt by the Individual Defendants to avoid liability and should not be permitted.

170.     A report in *The New York Times* on June 24, 2007 also provides:

Many analysts say they believe that Bausch, based in Rochester, is on the auction block thanks to [] poor management, and some large investors complain that the company is being offered up at a price they consider to be a steal. (Many of them have noted that Bausch traded for more than $80 a share just two years ago.)

. . . Mr. Braun, who runs the Classic Global Equity fund in Zurich and controls about 2.4 percent of Bausch's shares [observed] "Private equity and management do a deal which is good for both, because management gets to keep their jobs and get their unvested options, while private equity gets a good price. So they do the nice part themselves, while public, long-term shareholders end up as the losers," he adds.

171.     Thomas Sandell, whose Sandell Asset Management hedge fund bears his name, has $12 billion under management and owns approximately four percent of Bausch & Lomb, says his calculations show that even a conservative, five-percentage-point increase in margins and divestitures of lines like pharmaceuticals and surgical tools would value the Company at least $10 a share higher than Warburg Pincus's offer. "The cost structure is bloated and it seems to be really poorly managed," Mr. Sandell says. "Even if they can get margins to one-third of where Alcon is, we get to at least $75 a share. Right now, Warburg is getting a very good deal."

172.     Further, the $65-a-share, $4.5 billion offer from Warburg values Bausch & Lomb at about two times 2007 sales. Competitors like Alcon, Advanced Medical Optics, and Cooper trade at three to six times sales, according to an analysis by HealthCor Management, a fund that owns about 3.5 percent of Bausch & Lomb's shares and which has publicly expressed its intention to vote against the inferior Warburg Pincus merger.

173.     On July 26, 2007, Sandell Asset Management publicly stated that the Warburg Merger undervalues Bausch & Lomb, the AMO proposal was a superior offer, and expressed its intention to vote against the Warburg Merger.

174.     Accordingly, the Current Director Defendants have breached their fiduciary duties to Bausch & Lomb stockholders by causing the Company to enter into a merger agreement that

provides for the sale of Bausch & Lomb at an unfair price, and deprives Bausch & Lomb's public shareholders of maximum value to which they are entitled.

**Material Omissions in the Definitive Proxy**

175.    The Definitive Proxy fails to provide the Company's public shareholders with material information and/or provides them with materially misleading information concerning the Warburg Merger.

176.    The Definitive Proxy does not describe the process leading to Morgan Stanley's retention as a financial advisor.[3] This is of particular importance because the Definitive Proxy notes that Morgan Stanley and certain of its employees, including those advising the Special Committee with respect to the present transaction, may have committed investment funds in Warburg Pincus. Further, as noted above, Warburg is a financial advisory services client of Morgan Stanley. Considered in the aggregate along with the fact that the present transaction resulted from close business relationships between certain of the Director Defendants and individuals at Warburg Pincus, these omissions and/or misstatements raise red flags concerning Morgan Stanley's ability to independently and objectively discharge its duties to the Company in the context of the Warburg Merger.  Given the potential conflicts of interest arising from certain relationships between Morgan Stanley and Warburg, the Definitive Proxy must disclose what discussion, if any, took place among members of the Special Committee or the Board regarding the need to obtain an independent, third-party fairness opinion.

177.    The financial forecasts presented in the Definitive Proxy are inadequate to allow a shareholder to conduct a discounted cash flow analysis.  In addition to the elements disclosed at page

---

[3] In addition, the first Preliminary Proxy filed by Bausch & Lomb on July 10, 2007, did not describe the precise nature and magnitude of Morgan Stanley's fee agreement or the fees paid by Warburg Pincus to Morgan Stanley for financial advisory services.  Plaintiff Rainone raised these omissions in his SAC which defendants subsequently remedied by providing further disclosure in the revised Preliminary Proxy and the Definitive Proxy.   Specifically, Morgan Stanley will receive approximately .525% of the aggregate value of the Warburg Merger, consisting of $1 million which became payable by Bausch & Lomb on April 15, 2007, $3 million which became payable upon delivery of a fairness opinion and the remainder of which will become payable upon closing of the transaction.  The Definitive Proxy also discloses that since the beginning of 2006, Warburg Pincus has paid Morgan Stanley in excess of $65 million in fees for financial advisory services.

82, additional information must be disclosed, including, but not limited to, annual EBITDA (or, in the alternative, annual depreciation and amortization expense), effective cash tax rate, earnings per share, anticipated investments in net working capital and expenditures.

178.    At page 52 of the Definitive Proxy, there is somewhat substantial lip service paid to the fact that the Company's Board considered various strategic alternatives before recommending the Warburg Merger.  However, there is no discussion of specifically what alternatives (other than remaining a public company) the Board considered.  The Definitive Proxy must specify which alternatives were considered by the Board and disclose the nature and relevant assumptions of the financial analyses that led the Board to its conclusion that the Warburg Merger represented the most favorable outcome for shareholders.

179.    The Definitive Proxy should also disclose the nature, relevant assumptions and value indications of other analyses performed by Morgan Stanley (other than the "Discounted Equity Value" analysis) to estimate the stock component of the AMO proposal.

180.    Furthermore, the Definitive Proxy must disclose the specific framework and key assumptions used by the Company to estimate potential contingent liabilities of $3.72 per share as initially shown in the Definitive Proxy at page 61.

181.    The Definitive Proxy should also explain what is meant by the assertion that a 15% equity rate of return would be required by a "non-controlling public shareholder of the Company."

182.    The "Comparable Company" ("CC") analysis provided in the Definitive Proxy is also subject to numerous deficiencies.[4]  Foremost, Bausch & Lomb is a major competitor in the business of eye care products with a strong retail brand.  There is no explanation in the Definitive Proxy as to Morgan Stanley's rationale for applying low pricing multiples to the Company in relation to those observed for companies Morgan Stanley itself deemed "comparable" to Bausch & Lomb.  This raises

---

[4] The revised Preliminary Proxy and Definitive Proxy addressed certain omissions noted by plaintiff Rainone in the SAC concerning the CC analysis.  For example, the Definitive Proxy explains that the illustrative deduction of $3.72 per share to account for potential contingent liability exposure relates to existing reserves for potential contingent tax liabilities.  In addition, the Definitive Proxy now explains why Morgan Stanley used 2008 estimated earnings per share rather than 2007 earnings per share in the CC analysis.

serious concerns as each 1.0 increment in EBITDA multiple alters the indicated value by approximately $7 per share.  In addition, the Definitive Proxy also fails to disclose whether Morgan Stanley adjusted the results of its CC analysis for a transaction premium which is a customary and usual practice in the field of valuation.

183.   The Definitive Proxy contains a "Discounted Equity Value" analysis which is designed to provide insight into the future value of a company's common equity as a function of the company's future earnings and its forward price to earnings multiples.  One of the most important quantitative assumptions in this analysis is the cost of equity capital and understanding its origin is critical.  However, the basis and rationale for Morgan Stanley's estimate of a 15% cost of equity capital is not sufficiently explained in the Definitive Proxy.  Moreover, Morgan Stanley's estimate of a 15% cost of equity capital is wholly incompatible within this analysis as well as in the context of certain of its other analyses.[5]  For instance, a cost of equity of this magnitude cannot be accurate in light of the Company's historical next twelve months' price-to-earnings ratio of 17x to 21x chosen by Morgan Stanley.  Also, in its "Discounted Cash Flow" ("DCF") analysis, Morgan Stanley's own estimate of the Company's weighted average cost of capital is likewise inconsistent with this selection of a 15% cost of equity by implying an unreasonably leveraged capital structure for a company like Bausch & Lomb.  In addition, the Definitive Proxy must disclose Morgan Stanley's rationale for performing a discounted equity value analysis (Proxy, pp. 41 - 42) on the stock component of the AMO proposal using a 2009 base year when the synergies anticipated from any potential combination were not expected to reach their full potential until 2011.  Moreover, the Definitive Proxy should disclose the amount of annual, pre-tax synergies that Morgan Stanley assumed the combined company would achieve in 2009, and disclose any discounted equity value analyses performed by Morgan Stanley that considered periods beyond 2009.

---

[5] Notably, defendants attempted to cure this disclosure issue in the revised Preliminary Proxy and Definitive Proxy.  However, the explanation provided – that the rate of 15% is based on Morgan Stanley's "belief" that such rate reflects the return rate that would be required by a non-controlling shareholder – is insufficient because it fails to address the persistent incongruity with the discount rates Morgan Stanley used in its DCF analysis.

184.    The DCF analysis in the Definitive Proxy is similarly lacking.[6]   The rationale underlying Morgan Stanley's choice of perpetual growth rates of 1% to 3% is not described.  The choice of long-term growth rates is one of the more important assumptions in a DCF analysis, and 1% to 3% is extremely low in light of the Company's historical growth as well as for companies positioned in any segment of the healthcare industry.  Furthermore, there is no indication in the Definitive Proxy concerning whether any cost savings or other synergies expected from prospective transactions in the Company were considered.  Given the significant difference between the Warburg Pincus offer ($65 per share) and the AMO offer ($75 per share), these cost savings or other synergies would have a material impact on concluded values.  Moreover, additional information should be disclosed for the DCF analysis, including, but not limited to, annual EBITDA, or in the alternative, annual depreciation and amortization expense, effective cash tax rate, earnings per share and anticipated investments in net working capital and capital expenditures.  In addition, Morgan Stanley's rationale for extending management's projections from 5 years to 10 years in performing its discounted cash flow analysis should be disclosed.

185.    As set forth above, the Current Director Defendants are breaching their fiduciary duty to disclose to plaintiff and the Class all information material to their decisions regarding the Warburg Merger through these inadequate disclosures and material omissions in the Definitive Proxy.

186.    What makes the Warburg Merger even more egregious is the fact that Bausch & Lomb shareholders are not entitled to appraisal rights under New York law.  Thus, the conflicts inherent in the Warburg Merger, the inadequate price and the significant non-disclosures mandate that this Court issue and injunction.

187.    As set forth above, the Current Director Defendants are breaching their fiduciary duty to disclose to plaintiff and the Class all information material to their decisions regarding the Warburg Merger through these inadequate disclosures and material omissions in the Definitive Proxy.

---

[6] The Definitive Proxy also differs from the initial Preliminary Proxy in that defendants attempted to cure disclosure deficiencies which were raised by plaintiff Rainone in his SAC and which relate to Morgan Stanley's DCF analysis.  For example, the Definitive Proxy now contains an improved qualification of the discount rates of 8%-10% used in the DCF analysis.

## CLASS ACTION ALLEGATIONS

188.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of himself and all other shareholders of the Company, except the defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest, who are or will be threatened with injury arising from defendants' actions, as more fully described herein (the "Class").

189.   The members of the Class are so numerous that joinder of all members is impracticable.  Bausch & Lomb common shares are actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown at the present time and can only be ascertained through appropriate discovery.  As of the filing of the Company's Form 10-K on April 25, 2007, Bausch & Lomb had 54,382,184 shares outstanding, consisting of 54,353004 shares of common stock and 29,180 shares of Class B stock.  Record owners and other members of the Class may be identified from records maintained by Bausch & Lomb or its transfer agents, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

190.   The claims of the plaintiff bringing this complaint are typical of the claims of the members of the Class, as all members of the Class sustained damages from Individual Defendants' breaches of fiduciary duties.

191.   There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, inter alia, the following:

(a)   Whether the Current Director Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Warburg Merger;

(b)   Whether the Current Director Defendants are engaging in self-dealing in connection with the Warburg Merger;

(c)   Whether the Director Defendants have breached their fiduciary duties in failing to maximize shareholder value in connection with the Warburg Merger;

(d)    Whether the Current Director Defendants are unjustly enriching themselves and other insiders or affiliates of Bausch & Lomb through the Warburg Merger;

(e)    Whether the Current Director Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Warburg Merger, including the duties of good faith, diligence, honesty and fair dealing;

(f)    Whether the Director Defendants in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(g)    Whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

192.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

193.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

194.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

195.    The Current Director Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

196.    Plaintiff brings this action derivatively in the right and for the benefit of Bausch & Lomb to redress injuries suffered, and to be suffered, by Bausch & Lomb as a direct result of the breaches of fiduciary duty as well as the aiding and abetting thereof, by the Individual Defendants. Bausch & Lomb is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

197.     Plaintiff will adequately and fairly represent the interests of Bausch & Lomb in enforcing and prosecuting its rights.

198.     Plaintiff is and was an owner of the stock of Bausch & Lomb during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

199.     The Board of Bausch & Lomb at the time of commencement of this action consisted of the following eleven individuals: defendants Linen, Waltrip, Wolfe, Bennett, De Sole, McMullin, Wilson, Friedman, Rice, Zarrella and Burzik.   Plaintiff has not made any demand on the aforementioned Board members of Bausch & Lomb to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

(a)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the improper accounting.  While in possession of this material adverse, non-public information regarding the Company, the following members of the Bausch & Lomb Board participated in the illegal insider selling:

(i)     During the Relevant Period, defendant Zarrella sold 255,000 shares of Bausch & Lomb stock for proceeds of $16,689,318;

(ii)     During the Relevant Period, defendant Waltrip sold 156,279 shares of Bausch & Lomb stock for proceeds of $11,027,258.50;

(iii)     During the Relevant Period, defendant McMullin sold 4,630 shares of Bausch & Lomb stock for proceeds of $220,672.50;

(iv)     During the Relevant Period, defendant Wolfe sold 8,818 shares of Bausch & Lomb stock for proceeds of $603,357.77;

(v)     During the Relevant Period, defendant Rice sold 8,396 shares of Bausch & Lomb stock for proceeds of $546,218.29.  Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling.  Because these directors defendants have breached their fiduciary duties and are interested, any demand upon them would have been futile;

(b)     According to Bausch & Lomb's proxy statement filed with the SEC on or about March 24, 2005, defendants Wolfe, Bennett and De Sole were, during the Relevant Period, members of the Audit Committee.   The Audit Committee is responsible, by its charter, for monitoring: (a) the integrity of the financial statements of the Company; (b) the independent auditor's qualifications and independence; (c) the performance of the Company's internal audit function and independent auditor; and (d) the compliance by the Company with legal and regulatory requirements.  Bausch & Lomb's Audit Committee Charter states in relevant part:

The Audit Committee, to the extent it deems necessary or appropriate, shall:

Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

Review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in management's discussion and analysis, prior to the filing of its Form 10-Q, including the results of the independent auditor's reviews of the quarterly financial statements.

Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

Discuss with management the Company's release of earnings information, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information disclosed and the types of presentations to be made).

* * *

Discuss with management the Company's release of earnings information, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information disclosed and the types of presentations to be made).

* * *

Review the significant reports to management prepared by the internal auditing department and management's responses.

Thus, the Audit Committee was responsible for overseeing and directly participating in Bausch & Lomb's financial reporting process. Furthermore, as of December 27, 2003 Bausch & Lomb had 56 subsidiaries, only 13 of which were organized in the United States and non-U.S. net sales provided an extensive portion of the Company's revenue. Indeed, the Company's 2006 Form 10-K states that "the majority of [Bausch & Lomb's] business is conducted outside the United States." In 2000, 2001, 2003, 2004 and 2005, 53%, 60%, 61% and 62%, respectively, of the Company's net sales were from customers outside the United States. Given the significance of its foreign subsidiaries in providing more than half of the Company's revenue, the members of the Board and, more specifically, the Audit Committee either had direct knowledge of the accounting problems that plagued its foreign subsidiaries or were willful and reckless in not monitoring these subsidiaries properly. Accordingly, defendants Wolfe, Bennett De Sole, Waltrip, Linen, McMullin, Rice and Bennett breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of financial statements and earnings press releases that contained false and/or misleading material information. Particularly, for FY:00, defendants Waltrip, De Sole, Linen and McMullin served as members of the Audit Committee which met three times. For FY:01, defendants Linen, De Sole, McMullin, Rice and Waltrip served as members of the Audit Committee which met four times. For FY:02, defendants Linen, De Sole, McMullin, Rice and Waltrip served as members of the Audit Committee which met five times. For FY:03, defendants Wolfe, De Sole, McMullin and Rice served as members of the Audit Committee which met eleven

times.  For FY:04, defendants Wolfe, Bennett and De Sole served as members of the Audit Committee which met twelve times.  While these defendants served as members of the Audit Committee they also reviewed yet failed to correct Bausch & Lomb's improper Forms 10-Q and 10-K filed from FY:00 to FY:05.  As a result, Bausch & Lomb restated its financials for those years. Defendants Waltrip, Wolfe, McMullin and Rice's breaches of fiduciary duties were especially egregious as they utilized the material adverse, non-public information that they acquired via their participation on the Audit Committee to their own benefit via their participation in the illegal insider selling.  As a result of these defendants' liability for their breaches of fiduciary duties, any demand upon them would have been futile;

(c)    The principal professional occupation of defendant Zarrella is his employment with Bausch & Lomb, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  For FY:01, Bausch & Lomb paid defendant Zarrella $67,772 in salary and other compensation and granted Zarrella 500,000 options.  For FY:02, Bausch & Lomb paid defendant Zarrella $4,535,055 in salary and other compensation, $5,581,081 in restricted stock awards and granted him 500,000 options.  For FY:03, Bausch & Lomb paid defendant Zarrella $1,257,171 in salary and other compensation, $1,628,000 in bonus compensation, $1,745,178 in long term incentive payouts and granted Zarrella 180,000 options.  For FY:04, Bausch & Lomb paid defendant Zarrella $1,348,368 in salary and other compensation, $1,650,000 in bonus compensation, $2,383,049 in long term incentive payouts and granted Zarrella 117,650 options.  Accordingly, defendant Zarrella lacks independence from defendants Linen, McMullin, Waltrip and Wilson who are not disinterested and/or independent and who exert influence over defendant Zarrella's compensation by virtue of their positions as members of the Compensation Committee.  The Compensation Committee annually reviews and approves corporate goals and objectives relevant to Zarrella's compensation, evaluates Zarrella's performance in light of those goals and objectives, and

approves Zarrella's compensation level based upon this evaluation.  This lack of independence rendered defendant Zarrella incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)      Bausch & Lomb's non-employee directors receive substantial compensation in the form of annual retainers, consulting fees, stock option grants and Board and committee fees. Specifically, during FY:04 Bausch & Lomb paid defendants De Sole, McMullin, Rice, Friedman, Wilson and Bennett $144,834, paid defendants Linen, Purcell and Wolfe $150,034 and paid defendant Waltrip $169,834.  Accordingly, defendants Linen, Waltrip, Wolfe, Bennett, De Sole, McMullin, Wilson, Friedman and Rice are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and unvested stock options.  Thus, demand upon these defendants would have been futile;

(e)      In connection with Class B shares purchased under the Company's stock incentive plans prior to 2002, the Company could loan the participant an amount equal to the full amount of the purchase price of those shares, with the shares held by the Company as collateral for the loan.  The rate of interest on loans to participants was the lesser of the applicable federal rates announced monthly by the Internal Revenue Service pursuant to Section 1274(d) of the Internal Revenue Code of 1986, or nine percent.  Defendants McMullin, Rice, Purcell and Waltrip received such loans.  All loans to directors were paid in full in 2003.  Accordingly, these defendants could not have exercised independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action.  Thus, demand upon McMullin, Rice, Purcell and Waltrip would have been futile.

(f)      The entire Bausch & Lomb Board and senior management participated in the wrongs complained of herein.  Bausch & Lomb's directors are not disinterested or independent due to the following: defendants Linen, Waltrip, Wolf, Bennett, De Sole, McMullin, Wilson, Friedman

and Rice and Zarrella served on the Bausch & Lomb Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to Bausch & Lomb and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the Bausch & Lomb Board could not have exercised independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Bausch & Lomb to millions of dollars in liability for possible violations of applicable securities laws;

(g)     Defendants De Sole, Linen, McMullin, Rice, Waltrip and Wolfe signed each of Bausch & Lomb's Form 10-K filings that were filed with the SEC for FY:00 through FY:04.  These filings were each restated due to accounting improprieties.  Accordingly, demand would have been futile as to these defendants as they each face a substantial likelihood of liability for their breach of fiduciary duties owed to Bausch & Lomb;

(h)      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(i)     The Director Defendants of Bausch & Lomb, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Bausch & Lomb's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(j)     In order to bring this suit, all of the directors of Bausch & Lomb would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(k)     The acts complained of constitute violations of the fiduciary duties owed by Bausch & Lomb's officers and directors and these acts are incapable of ratification;

(l)     Each of the Director Defendants of Bausch & Lomb authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(m)     Any suit by the Board of Bausch & Lomb to remedy these wrongs would likely expose the Individual Defendants and Bausch & Lomb to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves; and

(n)     Bausch & Lomb has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Bausch & Lomb any part of the damages Bausch & Lomb suffered and will suffer thereby.

200.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Board has failed and refused to seek to recover for Bausch & Lomb for any of the wrongdoing alleged by plaintiff herein.

201.     Plaintiff has not made any demands on shareholders of Bausch & Lomb to institute this action because such a demand would have been a futile and useless act for the following reasons:

(a)      Bausch & Lomb is a publicly held company with over 53 million shares outstanding, and thousands of shareholders;

(b)      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

202.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

203.     The Individual Defendants owed and owe Bausch & Lomb fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Bausch & Lomb the highest obligation of good faith, fair dealing, loyalty and due care.

204.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

205.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

206.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Bausch & Lomb has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

207.     Plaintiff on behalf of Bausch & Lomb has no adequate remedy at law.

## COUNT II

### On Behalf of Plaintiff and the Class Against the
### Current Director Defendants for Breach of Fiduciary Duties

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    The Current Director Defendants have violated fiduciary duties of care, loyalty, candor and independence to the public shareholders of Bausch & Lomb and have acted to put their personal interests ahead of the interests of Bausch & Lomb's shareholders.

210.    By the acts, transactions and courses of conduct alleged herein, the Current Director Defendants, individually and acting as part of a common plan, are attempting to insulate themselves from liability and unfairly deprive plaintiff and other members of the Class of the true value of their investment in Bausch & Lomb .

211.    The Current Director Defendants have violated their fiduciary duties by entering into a transaction with Warburg Pincus to attempt to insulate themselves from liability and without regard to the fairness of the transaction to Bausch & Lomb shareholders.

212.    By the acts, transactions and courses of conduct alleged herein, the Current Director Defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of plaintiff and other members of the Class.

213.    The Current Director Defendants have violated their fiduciary duties by entering into a transaction with Warburg Pincus without regard to the fairness of the transaction to Bausch & Lomb's shareholders.

214.    As demonstrated by the allegations above, the Current Director Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Bausch & Lomb because, among other reasons: (i) they failed to properly value Bausch & Lomb; (ii) they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Warbrug Merger; and (iii) they failed to disclose all necessary information for an informed shareholder vote.

215.     Because the Current Director Defendants dominate and control the business and corporate affairs of Bausch & Lomb, and are in possession of private corporate information concerning Bausch & Lomb's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Bausch & Lomb which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits.  Moreover, shareholders have no right to seek appraisal under New York law and have no adequate remedy.

216.     By reason of the foregoing acts, practices and course of conduct, the Current Director Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

217.     As a result of the actions of Current Director Defendants, plaintiff and the Class will suffer irreparable injury as a result of defendants' self dealing.

218.     Unless enjoined by this Court, the Current Director Defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Warburg Merger which will exclude the Class from its fair share of Bausch & Lomb's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

219.     The Current Director Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

220.     Unless the Warburg Merger is enjoined by the Court, the Current Director Defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the acquisition terms, and will not supply to Bausch & Lomb's minority stockholders sufficient information to enable them to cast informed votes on the proposed acquisition and may consummate the proposed acquisition, all to the irreparable harm of the members of the Class.

221.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which the Director Defendants' actions threaten to inflict.

## COUNT III

### On Behalf of Plaintiff and the Class Against Warburg Pincus for Aiding and Abetting the Individual Defendants Breach of Fiduciary Duty

222.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein

223.    Warburg Pincus has knowingly aided and abetted the Current Director Defendants' wrongdoing alleged herein.  Warburg Pincus is also an active and necessary participant in the Current Director Defendants' plan to complete the Warburg Merger on terms that are unfair to Bausch & Lomb shareholders, as Warburg Pincus seeks to pay as little as possible to Bausch & Lomb shareholders.

224.    Warburg Pincus rendered substantial assistance to the Current Director Defendants. The substantial assistance includes, among others:

(a)    Offering to provide liability coverage to the Current Director Defendants;

(b)    Demanding the right to match any competing proposal in order to thwart other bidders; and

(c)    Offering members of management the right to participate in the equity of the new entity in order to gain the favor of the Individual Defendants for its deal.

225.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing Bausch & Lomb to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Bausch & Lomb and its shareholders from a repeat of the damaging events that occurred during the Relevant Period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

1.      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Bausch & Lomb to nominate at least three candidates for election to the Board;

3.      appropriately test and then strengthen the internal audit and control functions; and

4.      control and limit insider stock selling;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Bausch & Lomb has an effective remedy;

D.      Awarding to Bausch & Lomb restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.      Declaring that, as to Count II, this action is properly maintained as a class action;

G.      Enjoining the Current Director Defendants from proceeding with the Warburg Merger to the extent it includes protections or payoffs to defendants;

H.      Enjoining the Current Director Defendants from consummating the Warburg Merger unless, and until, the Director Defendants adopt and implement a procedure or process, such as an auction, to obtain the highest possible price for the Company; and

I.       Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  August 20, 2007                         FARUQI & FARUQI, LLP


 s/Beth A. Keller
NADEEM FARUQI (NF-1184)
SHANE T. ROWLEY (SR-0740)
EMILY C. KOMLOSSY (EK-5908)
BETH A. KELLER (BK-9421)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

Counsel for Plaintiff

## **VERIFICATION**

I, Beth A. Keller, hereby declare as follows:

1.      I am a member of the law firm of Faruqi & Faruqi, LLP, counsel for plaintiff Charles Zimmerman in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiffs are absent from the County of New York where my firm maintains its offices.

3.      Mr. Zimmerman is a current shareholder of Bausch & Lomb Incorporated and has owned his shares during the relevant period of the complaint.

Executed this 20th day of August 2007, at New York, New York

Beth A. Keller